448 So.2d 1287 (1984)
STATE of Louisiana
v.
George GRIFFON.
No. 82-KA-2186.
Supreme Court of Louisiana.
February 27, 1984.
Rehearing Denied March 23, 1984.
*1288 William J. Guste, Jr., Atty. Gen., Ossie Brown, Dist. Atty., Kay Kirkpatrick, Asst. Dist. Atty., John L. Lenfant, Barbara Rutledge, Asst. Attys. Gen., for plaintiff-appellee.
Frank Gremillion, Cyrus J. Greco, Baton Rouge, for defendant-appellant.
*1289 BLANCHE, Justice.
On January 30, 1980, the defendant, George Griffon, was indicted by the grand jury of East Baton Rouge Parish on thirty-two counts of medicaid fraud in violation of La.R.S. 14:70.1. Prior to trial, four counts were dismissed. After a bench trial, defendant was convicted on March 15, 1982 of twenty-two counts and sentenced as to each count on June 28, 1982 to serve consecutive one year terms in the parish prison, suspended upon restitution of $2,500. Additionally, as to each count, defendant was ordered to pay a fine of $2,500, default of which would result in one year in parish prison. La.C.Cr.P. art. 884.
The defendant is a registered pharmacist who owns fifty-one percent of the corporate shares of Griffon's Pharmacy, Inc., a corporation owning two pharmacies in Baton Rouge and Denham Springs. All twenty-eight counts tried relate to actions which took place at the store located at 1857 Government Street in Baton Rouge, which the defendant managed. Defendant signed a Pharmaceutical Services Provider Agreement with the Louisiana Department of Health and Human Resources (DHHR) whereby he agreed to fill prescriptions for medicaid recipients, to abide by the rules and regulations of the program, and to seek reimbursement through the state's fiscal intermediary, Electric Data Services Federal (EDS).[1] Provider Manuals, developed by DHHR and sent by EDS to all program participants, informed pharmacists which drugs were covered by the program, and also gave instructions for the proper completion and submission of claim forms. As specifically stated in the manual, the state would only reimburse pharmacists for drugs actually dispensed to medicaid recipients.
In 1979, investigators with the Medicaid Fraud Control Unit of the Attorney General's Office received information that pharmacists at Griffon's Pharmacy were filling medicaid prescriptions with generic drugs and billing the state for more expensive brand name drugs. The investigators, using a list generated by EDS computers that showed which medicaid recipients had gotten their prescriptions filled at Griffon's Pharmacy, interviewed several dozen recipients and examined the medication that had been dispensed to them by Griffon's Pharmacy. In several instances the investigators found that the prescription vials contained not the brand name medications listed on the labels, but generic substitutions. When substitutions were found, investigators seized the vials and samples of the medication. The investigators, using the EDS computers, then ran a "recipient profile" on each medicaid recipient interviewed. The profile listed the recipient's name, medicaid identification number, date of service, prescription number, National Drug Code (NDC) number of the drug dispensed, the amount that the pharmacy (provider) billed the state, and the amount the state reimbursed the provider. From this information, the investigators determined which prescriptions filled with generic drugs had been billed to the state as brand name drugs by the defendant. The confiscated medications were then sent to a pharmaceutical consultant for analysis and identification. Once the substitutions were confirmed by the consultant, the investigators obtained a search warrant pursuant to which a great many of the defendant's records, as well as a large quantity of generic drugs, were seized at Griffon's Pharmacy.[2] Several former and current employees of the pharmacy were interviewed. Defendant's employee-pharmacists were given use-immunity and several testified before the grand jury and at trial.
*1290 The thrust of the state's case is that the defendant submitted fraudulent claims for reimbursement in that he, as a principal,[3] dispensed generic drugs and submitted claims to the state for reimbursement for brand name drugs. The state does not contend that the substitution itself is a crime, rather that the submission of claim forms for reimbursement listing brand name medications rather than the generic drugs actually dispensed constitutes an intent to defraud the state under La.R.S. 14:70.1.
The defendant makes one argument on four assignments of error in this appeal.

Assignments of Error Numbers 1, 2, and 3
By these three assignments, defendant contends that the trial court erred by failing to grant directed verdicts as to all counts, returning a verdict of guilty as to twenty-two counts, and failing to grant a new trial. The basis for each assignment is that the state failed to prove beyond a reasonable doubt both that the defendant had the "intent to defraud the state" and that the defendant did in fact defraud the state.
La.R.S. 14:70.1 states:
The crime of medicaid fraud is the act of any person, who, with intent to defraud the state through any medical assistance program created under the federal Social Security Act and administered by the Department of Health and Human Resources:
(1) Presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise; or
(2) Knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise; or
(3) Knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise.
Whoever commits the crime of Medicaid Fraud shall be imprisoned with or without hard labor, for not more than five years, or may be fined not more than ten thousand dollars, or both.
From the outset, we find the defendant's contention that the state failed to prove beyond a reasonable doubt that the defendant did in fact defraud the state is irrelevant to the crime charged and is thus without merit. There is no requirement that the state actually be defrauded or lose money for a person to be in violation of the statute. The crime defined is the presentation of false or fraudulent claims for services or merchandise for payment or the submission of false information with knowledge of its falsity for the purpose of obtaining greater compensation than that to which one is entitled, with the intent to defraud the state. Thus, the crime is the presentation of a claim or submission of information with intent to defraud. There is no requirement that the party charged be successful in their endeavors to defraud.
Therefore, the only issue which merits examination is whether the state, on each count, proved beyond a reasonable doubt that the defendant had the intent to defraud the state. To determine this, an examination of the procedure for submitting claims is necessary.
Critical to this examination is the NDC number. This is a number assigned to each drug by the Federal Drug Administration. It is comprised of three basic parts: a number which indicates the manufacturer of the drug, a number which identifies the specific drug itself (the chemical), and a number which identifies the package size that the drug was sold in by the manufacturer. Thus, this one number will identify the manufacturer, the type of drug, and whether the drug was sold to pharmacies (providers) in sizes of 1000, 500 or 100 *1291 tablets, gallons, grams, milligrams, etc. The provider, when filling out a claim form for submission to the state for reimbursement, is required to place the NDC number of the drug dispensed on the claim form. The provider must also place on the claim form, among other information, the amount of the drug dispensed and the provider's usual and customary charge. This usual and customary charge is the price that the provider charges the general public (non-medicaid recipients) for that particular drug.
When processing these claim forms, the state, pursuant to federal law, must pay the lower of (a) the usual and customary charge set by the provider, or (b) the ingredient cost plus a dispensing fee. 42 C.F.R. 447.331. The ingredient cost is determined by the state by setting an "estimated acquisition cost" for each drug which is to be the state's best estimate of what providers generally are paying for the drug. 42 C.F.R. 447.332(C)(2). The basis for this estimate must be the package size providers buy most frequently. 42 C.F.R. 447.332(C)(3). Additionally, a third price is involved in the state's determination of what price to pay on these claims. For a certain number of designated drugs, the federal government has established a "maximum allowable cost" (MAC). If a drug dispensed is a MAC drug, the state must pay the lowest of:
(a) the usual and customary charge set by the provider (which includes a dispensing fee);
(b) the estimated acquisition cost (set by the state), plus a dispensing fee which is also set by the state; or
(c) the MAC price (set by the federal government), plus a dispensing fee.
The state, in setting up the program, had determined the ingredient cost for each drug, both brand name and generic, in each package size, and had entered these unit prices into EDS's computer under the NDC number of each drug. These unit prices are constantly updated. When a claim is submitted by a provider, the NDC number, the quantity dispensed, and the provider's usual and customary charge are entered into the computer. The computer then takes this information, makes the above described comparison for the NDC number provided, and determines which of the three prices to use in reimbursing the provider. Brand name drugs are more expensive than generic drugs and drugs purchased in smaller quantity packages are more expensive than those in large quantity packages. For example, the unit price for Darvon Compound 65, manufactured by Eli Lilly, in a 100 tablet package, is much more expensive to the provider than its generic equivalent, propoxyphene hydrochloride, manufactured by any of over thirty different manufacturers, in 1000 tablet packages. Thus, both the manufacturer and the package size are important factors in determining the unit price of a drug. The state had determined the estimated acquisition cost of each drug based upon the manufacturer and the package size. This is the basic information contained in the NDC number. The state contends that the defendant's practice of filling prescriptions with generic drugs and then filing reimbursement claims for those prescriptions using the NDC number for the brand name equivalent, constitutes an attempt to defraud the state out of the difference between the brand name price and the generic price.
The defendant contends, however, that his practice does not constitute an intent to defraud the state for two reasons. Defendant first argues that, for MAC drugs, the state will pay the MAC price for the generic drug regardless of the NDC number submitted for payment. The defendant argues that this is, and always has been, his interpretation of the way the procedure works. An examination of the state's evidence convinces us that such is not the case and that the defendant knew exactly what he was doing and knew the benefit he would reap in utilizing this scheme.
The state brought forth several of the defendant's past and current employee-pharmacists to testify as to the defendant's knowledge of what was occurring and his *1292 appreciation of the benefits to be gained. The testimony of past employee-pharmacists was introduced pursuant to La.R.S. 15:445 and 446[4] to establish the defendant's knowledge and intent. The testimony shows that, as early as 1974, the defendant made a practice of substituting generic drugs for brand names. In some instances, generic drugs were routinely transferred to brand name bottles on the defendant's stock shelf, in others the generics were mixed with brand name drugs, and in others the generic bottles were used directly. Testimony shows that the defendant ordered his pharmacists to fill prescriptions with generic drugs and to bill for the brand name. As new pharmacists came to work at the defendant's store, the defendant would pass the system on to them. The current employee-pharmacists that testified at trial confirmed that the scheme was in operation at the time the instant charges arose. These employee-pharmacists also were used to identify the specific prescriptions and claim forms involved with each count. James Morse, who worked as a pharmacist for Griffon from 1974 through the time the instant charges arose, testified that Griffon told him to fill prescriptions with generic drugs and bill for the higher priced brand name drugs. Griffon also told Morse to bill for the smallest package size rather than the larger package size in which Griffon purchased the medications. Morse related conversations that Griffon and he had about these substitutions and the illegality of them. Lynn Campagna, also a pharmacist who was employed by Griffon at the time of the charges, testified that Griffon told him to substitute generics and bill for brand name drugs for all MAC program drugs that he filled for nursing homes. For all prescriptions for off the street customers, Campagna continued to substitute generics and billed for brand names. Both Campagna and Morse testified that generic drugs were placed in brand name bottles on the stock shelf, and Morse testified that he himself had seen Griffon transfer generic drugs to brand name bottles. Each testified that the MAC price was greater than the acquisition price of the generics that they had dispensed. They also testified that the brand name price was greater than both the MAC price and the acquisition price so that use of the brand name NDC number on claim forms would result in the state reimbursing the defendant the MAC price rather than the lower acquisition cost of the generic actually disbursed.
The crime of medicaid fraud, La. R.S. 14:70.1, is a specific intent crime[5]. Specific criminal intent is defined under La.R.S. 14:10(1) as:
Criminal intent may be specific or general:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.

* * * * * *
In this case, the circumstances adduced at trial indicate that the defendant actively desired the proscribed criminal consequences to follow from his act. The evidence supports the trial court's finding that the defendant knowingly submitted false information, i.e. incorrect NDC numbers, for the purpose of obtaining greater compensation than that to which he was legally entitled with intent to defraud the state.
*1293 The defendant's second argument is that he cannot be guilty of this crime because the state failed to properly set up the program. Specifically, defendant cites the state's practice of setting an estimated acquisition cost for each specific package size rather than on the basis of the package size providers generally buy. The defendant contends that the federal regulations require one estimated acquisition cost for each drug type and manufacturer, see 42 C.F.R. 447.332(C)(2) & (3), rather than a separate price for each package size. This argument is without merit. Whether or not the state set one general price for each drug and manufacturer or set a price for each package size separately does not change the resultant benefit reaped by the defendant. The evidence at trial shows that, for the drugs involved in this case, the generic drugs of any package size were less expensive than the brand name drugs of the package size submitted on the claim forms.
Thus, as the state brought forth evidence supporting each element of the crime charged which was sufficient to sustain a conviction, the motion for a directed verdict was properly overruled by the trial court. La.C.Cr.P. art. 778; State v. Hargrave, 411 So.2d 1058 (La.1982). The defendant substituted generic drugs for the higher priced brand name drugs. The vials were labeled with and the state was billed for the higher priced brand name drugs. The overwhelming evidence establishes that it was through the defendant's direction and instruction that the fraudulent scheme was accomplished. While not necessary to support a conviction under the statute, it is evident that defendant's false claim for reimbursement resulted in more compensation than that to which he was entitled, all at the program's expense. The disparity in the price between higher priced brand name drugs and the lower priced generic drugs renders this conclusion inescapable.
Defendant's contention that the trial court erred in denying the motion for new trial is equally without merit. The ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only when there is a clear showing of an abuse of that discretion. State v. Graham, 422 So.2d 123 (La.1982); State v. Spell, 399 So.2d 551 (La.1981); State v. Manning, 380 So.2d 54 (La.1980). No such showing has been made.
Assignments of error 1, 2, and 3 are without merit.

Assignment of Error Number 4
By this assignment, defendant contends that fines and restitution totaling $110,000 is excessive.
For each count, the defendant was sentenced to pay a fine of $2,500, in default of which he was to serve one year in the parish jail, and he was sentenced also to one year in the parish jail, suspended. For each count, the defendant was additionally placed on bench probation on the condition that he make restitution to the DHHR in the amount of $2,500. The record shows that the trial judge amply articulated his reasons for the sentence. La.C.Cr.P. art. 894.1. The scheme to defraud the medicaid program had been in practice for at least six years, at great cost to the state and program, all as evidenced by the great volume of prescription business involving medicaid recipients enjoyed by the defendant through those years. The evidence shows that upwards of 200 prescriptions per day were filled by the Baton Rouge store. The seriousness of the crime is that funds which would and could have benefited needy medicaid recipients were unlawfully diverted to defendant's own use. The sentence is well within the statutory limit and we find no abuse of the wide discretion granted to the trial judge in the imposition of sentences and probation. La. Const. Art. I, § 20; La.C.Cr.P. arts. 894, 895; State v. Parker, 423 So.2d 1121 (La.1982); State v. McDermitt, 406 So.2d 195 (La. 1981).

DECREE
For the reasons assigned, the conviction and sentence rendered by the trial court are affirmed.
AFFIRMED.
*1294 WATSON, J., concurs and assigns reasons.
LEMMON, J., concurs. Defendant cannot contend that the condition of probation requires restitution for uncharged crimes [State v. Labure, 427 So.2d 855 (La.1983)] because defendant entered into a separate agreement with DHHR that the $55,000 restitution (upon affirmation of conviction) would discharge any civil liability.
WATSON, Justice, concurring.
While large fines and sizeable payments in restitution are not appropriate in the ordinary criminal case, under the particular circumstances of this case reflecting that the defendant had obviously profited over several years by substantial amounts, the trial court did not err in its sentence.
Therefore, I respectfully concur.
NOTES
[1] The dispensing of prescription drugs is a regulated occupation in Louisiana. See, R.S. 37:1171, et seq. For federal regulations, see generally, 42 C.F.R. 447.331, et seq.
[2] A voluntary participant in the Louisiana Medical Assistance (Medicaid) Program has no reasonable expectation of privacy with regard to business records involving the program. In Re: Morris Thrift Pharmacy, 397 So.2d 1301 (La. 1981); In Re: Rozas Gibson Pharmacy, 382 So.2d 929 (La.1980).
[3] La.R.S. 14:24 defines principals as:

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
[4] La.R.S. 15:445 states:

In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction.
La.R.S. 15:446 states:
When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged.
[5] See Reporter's Comments to R.S. 14:11.