533 So.2d 1264 (1988)
STATE of Louisiana, Plaintiff-Appellee,
v.
Antonio A. ROMERO and Jesusa N. Romero, Defendants-Appellants.
No. CR88-332.
Court of Appeal of Louisiana, Third Circuit.
November 9, 1988.
*1266 Thomas L. Lorenzi, Godwin, Roddy, Clifford L. Newman, Newman & Thibodeaux, Lake Charles, for defendants-appellants.
Cynthia Killingsworth, Glen Petersen, Asst. Attys. Gen., Baton Rouge, for plaintiff-appellee.
Before GUIDRY, STOKER and KING, JJ.
*1267 STOKER, Judge.
The defendant physicians in this case were convicted of numerous counts of Medicaid fraud, violations of LSA-R.S. 14:70.1. Each defendant was sentenced to five years at hard labor on each count to run concurrently but was given a suspended sentence and was placed on probation. The defendants appeal. Although we set aside the convictions of Dr. Antonio Romero on certain counts and remand them to the trial court for a new trial on these counts, we affirm his conviction on the other counts. Accordingly, we affirm Dr. Antonio Romero's sentences on the valid counts. We affirm the convictions and sentences of Dr. Jesusa Romero.
In 1970, defendants-appellants, Antonio and Jesusa Romero, husband and wife, located their medical practice in DeQuincy, Louisiana. They also became staff physicians at DeQuincy Memorial Hospital and at Greenhill Nursing Home. The two physicians enrolled in the Louisiana Medical Assistance Program (Medicaid) on November 25, 1980. Medicaid compensates physicians for medical services provided to eligible low-income persons. Enrollment consists of a contract with the State whereby the provider agrees to adhere to published regulations, maintain records, accept reimbursement pursuant to State procedures and to furnish information regarding any payments claimed on request of the Medicaid Fraud Control Unit for three years from date of service.
Upon entering the program, a physician provider is furnished with a provider manual which contains the instructions, rules and regulations for the program promulgated by the Department of Health and Human Resources. The manual instructs physicians to use the Physician's Current Procedural Terminology (CPT) book, which provides the codes to use in making a claim. The CPT book is not furnished to the provider by Medicaid, but must be purchased from the American Medical Association.
Several codes are involved in making a claim, such as billing procedure codes, diagnosis codes, service codes and unit codes. Each different service and diagnosis rendered must be itemized in code on the claim. There are six types of office visits and five levels of consultations under the coding system, and hundreds of diagnosis codes. Not all of the codes listed in the CPT book are used by the Medicaid System since the book has not been wholly adopted by Medicaid. However, the provider manual contains broad descriptions of what types of services are covered by Medicaid and the provider can call the fiscal intermediary or State Medicaid office to determine if a particular code is covered.
To receive reimbursement, a provider files a uniform claim form, the HCSH 1500, using the appropriate codes and information from the identification cards furnished by Medicaid to eligible recipients. The claim form is first submitted to the recipient's primary health insurer, if any, which then "crosses over" the claim to Medicaid's fiscal intermediary, the secondary payer. Medicaid payments are made by the fiscal intermediary, a corporation hired by the State to provide claims processing services. Each claim is assigned an ICN (internal control number). The payment check is accompanied by a remittance advice form which has the ICN, date of service, date of payment, the amount paid and the check number.
The fiscal intermediary relies on the accuracy of the claim form to compensate a provider and has few processing safeguards which will prevent fraudulent claims. The fiscal integrity of the Medicaid program is largely dependent on the good faith of the provider in accurately reporting and coding services rendered. There is a post-payment review by the SURS (Surveillance and Utilization Review System), a part of the MMIS (Medical Management Information System) structure. The SURS obtains additional information from providers who submit incomplete claim forms and investigates at least a certain minimum number of providers per quarter who consistently made unusual claims, i.e., high billing. There are also between 300 and 400 computer edits for such problems as ineligible codes, ineligible recipients, duplicated *1268 claims and excessive fixed charges. However, there is no procedural safeguard against submission of false information. The Medicaid Fraud Control Unit, a division of the attorney general's office, investigates possible fraudulent claims.
In addition to processing approximately 15 million claims per year, of which approximately 12 million are paid, the fiscal intermediary holds regular seminars to aid providers in billing, provides written updates on policy and procedural changes in the program and visits providers on request. The defendants in this case requested assistance in billing procedures five times and, in response, received personal visits from fiscal intermediary representatives in 1981, 1984 and 1986. In 1984, particularly, billing problems were discussed and reviewed.
In 1984 the Medicaid system was contracted to a new fiscal intermediary and was substantially revised due to the number of problems in claims processing under the old fiscal intermediary. The problems were so extensive that there was a legislative oversight committee investigation. The method of filing claims was not changed under the new fiscal intermediary, although the method of payment was. Under the old system, which was in effect from 1981-1983, when a provider's claim could not be paid due to processing problems, payment was made to the provider by the State on the basis of a "usual volume" formula until the claim processing problem was resolved. Under the "usual volume" method of payment exact remittance was not made, resulting in either under or over payment to the provider.

MEDICAID FRAUD ALLEGED
In this case, the State alleged that defendants committed acts of Medicaid fraud in 1983, 1984 and 1985 through the following five billing schemes:
(1) over-billing office visits through billing for a comprehensive office visit when a lesser level of service was rendered;
(2) billing for followup visits for patients released from the hospital although the patient did not receive followup services;
(3) billing telephone calls from nursing home personnel as medical consultations;
(4) billing telephone calls from emergency room nurses as emergency room visits; and
(5) billing for nursing home visits which were never rendered.
Defendant, Dr. Antonio Romero, was charged with 67 counts of Medicaid fraud and convicted on 60 counts. Defendant, Dr. Jesusa Romero, was charged with 33 counts of Medicaid fraud and convicted on 28 counts. The counts charged represent about one percent of the defendants' Medicaid claims for 1983-1986. The convictions of both defendants represent a total loss to the State, over a three-year period, of $1,863.68. Dr. Antonio Romero was sentenced to five years at hard labor on each count to run concurrently. The sentences were suspended and Dr. Antonio Romero was placed on probation for three years with a special condition that he perform 40 eight-hour days of community service, preferably by providing free medical care if permitted to maintain his license. Dr. Jesusa Romero was sentenced to five years at hard labor on each count to run concurrently. Her sentences were suspended and she was placed on probation for three years with a special condition that she perform 20 eight-hour days of community service, preferably by providing free medical care if permitted to maintain her license. The cost of prosecution of this case, $39,802.78, was assessed to and divided between the two defendants equally and each is to pay a $25 monthly supervision fee, plus a $5,000 fine as a condition of probation, and court costs. Defendants appeal their convictions and assign 19 assignments of error. Defendants have not appealed their sentences.

Assignment 1
Defendants contend the trial court erred in permitting the admission of "other crimes" evidence by the State following a pretrial hearing. They argue that the prejudicial effect of the evidence outweighed its relevance and its admission achieved only the prohibited purpose of proving bad character.
*1269 In State v. Kahey, 436 So.2d 475 at 488 (La.1983), the court analyzed the use of evidence of similar acts to prove intent:
"La.R.S. 15:445 provides that `in order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transactions.' The relevancy of other crimes to prove intent stems from the doctrine of chances. The attempt is merely to discover the intent accompanying the act in question; and the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent. The argument is based purely on the doctrine of chances, and it is the mere repetition of instances, and not their system or scheme, that satisfies our logical demand. 2 Wigmore, Evidence, § 302 p. 200 (3rd ed. 1940). Professor McCormick has stated that for questions of intent, the purpose of which such evidence may be relevant is to show by similar offenses that the act for which the defendant is on trial was not inadvertent, accidental, unintentional, or without guilty knowledge. See McCormick, Evidence § 190 at 450 (Cleary ed. 1972). Before evidence of other crimes is admitted as proof of intent, however, three prerequisites must be satisfied: (1) the prior acts must be similar, La.R.S. 15:445, Wigmore, supra; (2) there must be a real and genuine contested issue of intent at trial, State v. Monroe, 364 So.2d 570 (La.1978), State v. Nelson, 357 So.2d 1100 (La.1978), State v. Germain, supra [433 So.2d 110 (La.1983) ]; (3) the probative value of the evidence must outweigh its prejudicial effect, State v. Harris, supra [383 So.2d 1 (La.1980) ], State v. Prieur, supra [277 So.2d 126 (La. 1973)]."
In the case before us, the evidence of similar acts consisted of instances of improper billing of non-Medicaid patients. Intent is a crucial issue in proving fraud. Since evidence of similar acts is highly relevant to the material issue of intent, the probative value of the evidence of similar acts outweighs its prejudicial effect. See State v. Humphrey, 412 So.2d 507 (La. 1981). Moreover, upon each request by defendants during introduction of the evidence of similar acts and also in a final jury charge, the trial judge instructed the jury as to the limited purpose for which the evidence was received.
Therefore, the trial court did not err in allowing the State to introduce evidence of similar acts to prove the crimes charged.

Assignments 2 & 3
Defendants contend the trial court erred in permitting introduction of Medicare remittance advice forms as constituting a "claim," thereby providing an essential element of Medicaid fraud, and in ruling that "cross-over" claims submitted by Medicare to Medicaid constitute Medicaid claims.
The evidence has established that a uniform printed claim form is used for Medicaid, Medicare and insurance companies. If an eligible Medicaid recipient has other health insurance also, such as Medicare, the claim is submitted by the provider to this primary insurer first, which, after paying its portion of the claim, "crossesover" the claim to Medicaid, the secondary insurer. In this case, the primary insurer, Medicare, paid its portions of the claims and then submitted the claims to Medicaid, for payment of its share of the claims, by means of a magnetic computer tape onto which many claims were transcribed. Thus, there were two payers on the same claim.
Defendants objected to the cross-over claims on the ground that they were claims filed with Medicare, not Medicaid, and therefore are irrelevant to this case. However, under the system for processing a claim described above, this position is untenable. The same claim is processed by both Medicare and Medicaid; it simply passes through Medicare first for first payment. The cross-over claims are Medicare-Medicaid claims made by defendants.
*1270 The remittance advice forms were introduced merely to show the connection between each claim and the amounts paid on them by Medicare and by Medicaid. They are merely receipts and were not introduced as actual claims.
Further, the cross-over claims and remittance advice forms do not constitute "other crimes" evidence. The State neither alleged nor attempted to prove fraudulent Medicare claims. The evidence was introduced merely as proof of the claims made by defendants against Medicaid.
These assignments lack merit.

Assignment 4
Defendants contend the trial court erred in permitting the State to introduce patient files without waiver of the physician-patient privilege by the patient. LSA-R.S. 15:476 provides in pertinent part:
"§ 476. Privileged communications between physician and patient; exception
"No physician is permitted, whether during or after the termination of his employment as such, unless with his patient's express consent, to disclose any communication made to him as such physician by or on behalf of his patient, or the result of any investigation made into the patient's physical or mental condition, or any opinion based upon such investigation, or any information that he may have gotten by reason of his being such physician; ...."
LSA-R.S. 15:478 provides:
"§ 478. Right to exclude testimony, nature of privilege; waiver
"The right to exclude the testimony, as provided in the three articles last preceding, is purely personal, and can be set up only by the person in whose favor the right exists. If the right is waived, the legal adviser, the physician and the clergyman, as the case may be, may be examined and cross-examined to the same extent as any other witness." (Emphasis added)
The purpose of the physician-patient privilege is to protect confidential communications made by the patient to the physician. The privilege exists in favor of the patient and the right to exclude testimony under the privilege is purely personal to the patient.
Since the patients are not parties in this case, no prejudice to the patients can arise. Moreover, the records were not introduced in order to disclose confidences made by the patients to the defendant doctors, but for the limited purpose of showing correlation between the actual dates of the visits and treatments by the doctors and the dates indicated on the Medicaid claims forms filed, which are non-privileged matters. See LSA-R.S. 15:476. Therefore, this case does not present a situation to which the physician-patient privilege applies; nor do the defendants in this case have standing to invoke the privilege in order to protect themselves.
This assignment lacks merit.

Assignments 5 & 6
Defendants contend the trial court erred in qualifying Henry Rothschild, M.D., as an expert witness in general medicine and in permitting Dr. Rothschild to testify to his opinion regarding the degree of comprehensiveness of an examination based strictly upon his examination of medical records.
Although opinion testimony by a witness is generally inadmissible, on questions involving knowledge obtained only by special training or experience the opinions of persons having such special training or experience are admissible as expert testimony. LSA-R.S. 15:463 and LSA-R.S. 15:464. Competency of an expert witness is a question of fact within the sound discretion of the trial judge. His assessment of the qualifications of experts will not be disturbed unless clearly wrong. State v. Davis, 445 So.2d 163 (La.App.3d Cir.1984).
In this case, Dr. Rothschild testified that he received a medical degree in 1958 from the University of Chicago and a Ph.D. from Johns Hopkins. He is currently engaged in private practice and is a professor of medicine at LSU Medical Center. Dr. Rothschild has published articles and edited books in the medical field. He testified that he specializes in internal medicine and geriatrics but that he is not board certified *1271 in general medicine. Dr. Rothschild teaches courses in general medicine and stated that his field of expertise, geriatrics, could be considered general medicine as it pertains to persons 65 years and over. Moreover, at least 30% of his patients are Medicaid recipients for whom he must make Medicaid claims.
We find no abuse of the trial court's discretion in accepting Dr. Rothschild as an expert in the field of general medicine, considering his education and experience. The lack of a specific board certification in the field of general medicine does not preclude a finding that he is capable of rendering expert testimony in the field of his experience. State v. Robins, 499 So.2d 94 (La.App. 1st Cir.), writ denied, 500 So.2d 411 (La.1986).
At trial, the State relied on Dr. Rothschild's testimony to outline the requisites and characteristics of a comprehensive office visit, as defined in Medicaid's CPT code book. Dr. Rothschild testified as to whether the notations for office visits in various patient records of the defendants reflected a CPT defined comprehensive office visit and in what respects, if any, they fell short of it. He clearly stated that his expert opinion was based only on the notations in the records and that he had no personal knowledge of whether further services were actually rendered in each instance. Moreover, Dr. Rothschild stated that he, personally, is not an extensive note taker in his private practice, although there are minimal limits so that the billing clerk can know how to code the claim. The trial judge instructed the jury, prior to its rendering a verdict, that the weight to be given the expert testimony was exclusively within the jury's province.
Since Dr. Rothschild's testimony was within his field of expertise and ultimate questions of fact were reserved for the jury, we find the trial judge was not clearly wrong in allowing the witness to testify as to the notations in the patient records.

Assignment 7
Defendants contend the trial court erred in permitting the State to introduce documents bearing underlines placed by the prosecution to call the jury's attention to specific information to the exclusion of other information throughout exhibits 1 through 114.
Exhibits 1 through 114 consisted, among other things, of claims and remittance advice forms. Each of these forms listed numerous legitimate claims not pertinent to the charges, besides the alleged fraudulent claims. The State highlighted the information pertinent to the alleged fraudulent claims by underlining it. LSA-R.S. 15:458 provides:
"§ 458. Condition precedent to receipt of altered instrument as evidence
"The party relying upon a written instrument must, before such instrument is receivable in evidence, satisfactorily account for any erasure or interlineation which operates a substantial change of such instrument."
In this case, the State explained that the underlining was strictly for convenience and to save time. We find this explanation satisfactory. Moreover, the substance of the documents was not changed by the underlining. The underlining merely pointed out particular parts of the document the State wished to single out insofar as the charges against defendants, while leaving the document itself in evidence in its entirety. The other information on the documents was not excluded by the underlining. The underlining saved the jury considerable time, when viewing the documents, in finding which claims the State was referring to. Any advantage to the State from the underlining was compensated for when the court allowed defendants to underline any part of the documents they wished to emphasize. Therefore, the underlining was not prejudicial to defendants and this assignment lacks merit. See also, State v. Moore, 419 So.2d 963 (La.1982).

Assignment 8
Defendants contend the trial court erred in permitting the introduction of the DeQuincy Memorial Hospital Business Office emergency room reports (blue copies) because the State failed to lay a proper foundation. The blue business office copies *1272 of the emergency room reports were introduced as carbon copies which originally had been attached to the top white copies (the originals). The originals had previously been introduced and accepted into evidence. Betty Yarbrough, an investigator for the Medicaid Fraud Control Unit, testified that she seized the emergency room reports. Faye Brantley, the medical records custodian at DeQuincy Memorial Hospital since 1981, testified that she turned over the white original emergency room records to Betty Yarbrough and identified both the white originals and the blue copies. Michael Daykin, the controller at DeQuincy Memorial Hospital in charge of the business office and switchboard, identified the blue copies as the business office copies of the emergency room records and stated that he was unaware that they had been removed from his office.
Defendants argue that, since Daykin was unaware that the blue copies were missing from his office, he had never seen these particular records before and could not say whether they were in the same condition as they were when they were removed from his office, and for this reason the records were not sufficiently identified for admission into evidence. The trial judge found that, upon consideration of all the testimony surrounding the documents and after comparison with an original, the blue copies are carbon copies of the white originals. No alleged alterations to the blue copies were pointed to by the defense. In fact, the State introduced the blue copies in order to show alleged alterations to the white originals, purportedly by the defendants, after the blue copies were detached.
We find no abuse of the trial court's great discretion in determining the sufficiency of the foundation laid for the introduction of evidence. See LSA-R.S. 15:456; State v. Peters, 302 So.2d 888 (La.1974), cert. denied, 423 U.S. 878, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975).

Assignments 9, 10 & 11
These assignments relate to the medical records of the Greenhill Nursing Home. Defendant contends that these records were erroneously admitted as business records, that they are not admissible as hospital records and that they are irrelevant as to the consultation counts.
Defendant contends, first, that the trial court erred in admitting into evidence the medical records from Greenhill Nursing Home as business records. The counts at issue in this assignment are 6, 7, 22-27, 35-47, 49, 51-55 and 57-58, which are applicable only to Dr. Antonio Romero. The records consist of nurses' notes, doctor's progress sheets and doctor's order sheets. The custodian of the medical records of Greenhill Nursing Home identified the records.
At trial the court permitted the introduction of the records by the custodian under the business records exception to the hearsay rule and accepted some of them into evidence. The court subsequently reversed itself and held all of the records to be inadmissible because they were unreliable and untrustworthy.
The State then applied to this court for emergency supervisory writs on the trial court's ruling of inadmissibility, and we held that unreliability affected the weight to be given to the evidence, not its admissibility. The defendants then applied to the Supreme Court for supervisory writs which were denied with the express reservation of the right of defendants to raise this issue on appeal in the event of conviction. Therefore, this court is not precluded from reviewing these issues on appeal by the "law of the case" principle. See also, State v. Young, 443 So.2d 608 (La.App.3d Cir. 1983).
In reviewing these events, we note that defendants did not object to the reliability of foundations of some of the disputed exhibits until after their initial admittance into evidence. However, the trial court improperly admitted the exhibits as business records. Further, the subsequent objections by defendants, including objections as to lack of foundation, clearly encompassed all of the evidence now disputed on appeal. The ruling of the trial court as to inadmissibility and the two subsequent writs encompassed all of the disputed evidence. At no point during trial, nor in its *1273 application for writs, did the State raise the issue of lack of contemporaneous objections. After denial of the writ by the Supreme Court, the trial court admitted all of the disputed exhibits, noting that although some of them were previously offered and accepted into evidence over objection and others were just offered, inasmuch as the earlier admissions had been reversed, all of the exhibits were being filed into evidence at that time. Considering the complexity of the circumstances surrounding the introduction of these exhibits, we believe it is fair to find that none of the exhibits now at issue were admitted into evidence until after the denial of the writs by the Supreme Court. Therefore, we hold the State's arguments concerning the timeliness of defendants' objections are without merit.
As an alternative justification for admission of the nursing home records the State also argues that, since it relies on the lack of entries in the records to show that Dr. Romero did not actually visit the nursing home, a hearsay exception is not necessary to admit the records because non-hearsay is involved. However, the State clearly relies on a correlation of dates between the records introduced to prove each count and the fact that entries on other dates do make note of Dr. Romero's visits. Therefore, since the contents of the records are relied on, a hearsay exception is necessary to admit the records into evidence.
The records were not admissible under the business records exception to the hearsay rule because the State did not show, as a foundation for their admission, that the persons who made the records were genuinely unavailable to testify. See State v. Monroe, 345 So.2d 1185 (La.1977). In fact, several of the persons who made the records later testified as witnesses for the State.
However, we find that the records were admissible on another basis. They were admissible under the hospital records exception to the hearsay rule, LSA-R.S. 13:3714,[1] which has been jurisprudentially made applicable to criminal cases. See State v. Wientjes, 341 So.2d 390 (La.1976). We hold, initially, that nursing home records do fall within the scope of LSA-R. S. 13:3714 under the definition of "hospital records" in LSA-R.S. 13:3715.1.[2] Moreover, many of the medical records introduced are original records, not copies, which were identified by the testimony of Greenhill's medical records custodian. See LSA-R.S. 15:456. Although some of the exhibits are copies which are neither certified nor signed by the administrator or hospital records librarian as required by LSA-R.S. 13:3714, the original of each copy was also admitted as a separate exhibit. Therefore, there are no foundation problems with respect to the copies used as exhibits.
We now turn to consideration of defendant's constitutional right to confront those witnesses testifying against him. U.S. Const. Amend. VI; La. Const. Art. I. § 16 (1974). LSA-R.S. 13:3714 provides that a hospital record is admissible if the party against whom it is sought to be used is allowed to summon and cross-examine *1274 the person who made the original record. Because the records in this case were admitted under the business records exception rather than the hospital records exception, which we now find was a basis for admitting the records, Dr. Antonio Romero was not on notice at trial that the records would be admissible on this basis. Six of the persons[3] who made the original records were not subsequently called by the State as witnesses. Consequently, defendant has never been given an opportunity to exercise his constitutional right to confront and cross-examine those persons. This is particularly crucial as the statements set forth in the records were not made under oath. See State v. Wientjes, supra; State v. Monroe, supra; G.W. Pugh, "Hospital RecordsRight of Confrontation," in Louisiana Evidence Law 490 (1974). In State v. Monroe, supra, the court stated, "Although the right of confrontation is not absolute, it is generally accepted that any qualification of the right must be justified by necessity and attended by strong assurance that evidence admitted thereunder will be reliable.... In criminal trials, however, the accused's rights to confront and cross-examine the witnesses against him are of paramount concern." 345 So.2d at 1189.
Although we conclude that the nursing home records could have been admitted as hospital records at the trial, we should not conclude that they are properly in the record without affording defendant an opportunity to cross-examine the custodians under LSA-R.S. 13:3714. In this connection we note that the trial court was of the opinion that the records in question were unreliable and untrustworthy.
We must now determine whether the admission of these records constituted harmless error to the defendant. In other words, is there enough evidence, without these records, to support defendant's convictions? The State relied on the correlation of the dates and entries in the record exhibits for each count to establish that defendant did not make the nursing home visits claimed. The records, and the testimony of their authors, were the only evidence introduced on these counts. Therefore, without these records, there is insufficient evidence to support defendant's convictions. The improper admission of the listed exhibits was not harmless error beyond a reasonable doubt and requires reversal of defendant's convictions on the affected counts. See State v. Vessell, 450 So.2d 938 (La.1984). Defendant's convictions and sentences on counts 6, 7, 22, 25, 35, 37, 39, 43-45, 47, 49, 50-55, 58, 59, 61, 62, 64-66, 68-71, 73, 75 and 76 are set aside and remanded for new trial.
As a final argument, defendant contends that the records of the Greenhill Nursing Home were irrelevant to show falsely claimed consultation charges on counts 22-27, 39, 40 and 53. The records were introduced to establish defendant's absence from the nursing home on dates for which consultations were billed. The State alleges that defendant made phone calls to the nursing home on those dates which were billed as consultations. The trial court ruled that the evidence was irrelevant in that the failure to appear at the nursing home did not tend to establish any element of the charged crime. Under supervisory writ, this court ruled that the evidence was admissible. As noted above, the question is still open to review on appeal to this court.
The trial judge's determination of relevancy is entitled to great weight and will not be overturned absent a clear abuse of discretion. State v. Caldwell, 504 So.2d 853 (La.1987). At trial, the CPT definition for consultation was read. Testimony was presented to explain that a telephone call could not constitute a consultation, nor could the rendering of medical services to one's own patient. The fact that defendant sought to bill Medicaid for consultations when only a phone order was made on his own patients tends to establish an element of the crime charged. Thus, the trial judge's determination of irrelevancy was an abuse of its discretion and the ruling of this court on supervisory writ admitting the exhibits was correct.
*1275 In conclusion, the nursing home medical records were inadmissible as business records but admissible as hospital records. As hospital records, defendant's right to confrontation was denied for some of the records. Therefore, we set aside defendant's convictions and sentences on counts 6, 7, 22, 25, 35, 37, 39, 43-45, 47, 49, 50-55, 58, 59, 61, 62, 64-66, 68-71, 73, 75 and 76 and remand for a new trial on these counts. We find no error in this court's prior determination as to the relevancy of the records on the consultation counts.

Assignments 12 & 13
Defendants allege the trial court erred in refusing to give their requested jury charge on specific intent and in refusing to reinstruct the jury on specific intent in response to the jury's request for further instruction distinguishing attempt from the completed offense.
A requested special charge need not be given if it is included in the general charge or in another special charge to be given. LSA-C.Cr.P. art. 807. In the instant case the court's charge to the jury on specific and general intent substantially incorporated the special requested charge. Moreover, it was an an accurate and complete statement of the law on intent. Therefore, the trial court did not err in refusing to give defendants' requested jury charge.
Upon the jury's request for further instructions to clarify the difference between an attempted and a completed offense, the court complied with the request and reminded the jury that each statute would require a finding of specific intent. There was no error in the trial court's determination not to repeat the instructions regarding specific intent. These assignments lack merit.

Assignment 14
Defendants contend the trial court erred in permitting introduction of the CPT books and the provider manual over objection that each constitutes hearsay. The CPT books are published by the American Medical Association for the use of Medicaid, Medicare and insurance companies. The provider manual is published by the State Medicaid office. At trial, defense counsel objected to introduction of three of the CPT books on the basis that they contain hearsay and also argued that no foundation had been laid for their admission into evidence. The 1977 CPT book was admitted into evidence without objection. The provider manual was objected to only on the basis of lack of foundation.
To perfect an issue for appellate review, defense counsel should make known to the court the action which he desires the court to take or his objections to the action of the court, together with grounds therefor. LSA-C.Cr.P. art. 841. A new basis for an objection cannot be raised for the first time on appeal. State v. Digilormo, 505 So.2d 1154 (La.App.3d Cir.), writ denied, 511 So. 2d 1153 (La.1987). Moreover, directories and other compilations generally used and relied upon by the public or by persons in particular occupations have been recognized as highly trustworthy and have been considered exceptions to the hearsay rule of which judicial notice can be taken. State v. Scramuzza, 408 So.2d 1316 (La. 1982); Friedman Iron & Supply Co. v. J.R. Beaird Co., 222 La. 627, 63 So.2d 144 (1953); La.Evid.Code art. 803(17) (effective Jan. 1, 1989) and (Official) Comments. The trial court did not err in admitting the CPT Books and provider manual into evidence.

Assignment 15
Defendants contend that their constitutional rights to confrontation, cross-examination, due process and fair trial were violated by the State's failure to call rebuttal witnesses to prove a basis in fact for its attempt to impeach the credibility of Amy Fontenot in cross-examination.
Amy Fontenot, a witness for defendants, testified that defendants provided medical care to her non-ambulatory daughter in her home and at her car in their office parking lot. Fontenot testified about a visit paid to her home by one of the State's attorneys who questioned her about defendants. She recounted how she ordered him to leave her home by threatening to call the police when he allegedly called her a liar and refused to *1276 explain in what respect he believed her to be lying. Fontenot also testified that although she had never met Yarbrough, a State investigator, or the other State attorney, she had spoken to Yarbrough on the phone when Yarbrough called her to apologize for the State attorney's conduct. She said that she had seen other people in the State attorney's car when he visited her home, although she was unable to identify them in court because the car had been parked too far away. Fontenot also recalled a visit to her house by a very nice State investigator.
The State attorney of whose behavior Fontenot complained conducted the crossexamination of Fontenot. He attempted to impeach her credibility by seeking to demonstrate that she had lied on direct examination and that her ability to recall details of her conversations with himself and the investigators was poor. The State requested and was granted sequestration of the State investigators with whom Fontenot had testified she had contact. The State made this request to protect itself in the event the State would later decide to call the investigators as witnesses to rebut Fontenot's testimony. The State, however, did not subsequently call these people to testify.
Defendants now complain of the State's failure to call these prospective witnesses on several grounds. First, we find the State had no duty to call the prospective witnesses on direct examination, and the fact that it did not do so implies that they would have testified adversely to the State. We see no prejudice to defendants thereby. Second, we find no violation of defendants' rights to due process, a fair trial and to confront and cross-examine since the investigators did not testify as witnesses for the State. Third, the State was entitled to test Fontenot's memory concerning the events she testified to by cross-examination. State v. McClinton, 399 So.2d 178 (La.1981). The State was also entitled to attempt to impeach Fontenot by cross-examination to show she had testified falsely on direct examination. LSA-R.S. 15:280, 486. It was not necessary for the State to call rebuttal witnesses. Although the attempted impeachment may arguably have been as to collateral facts or irrelevant matters, doubts as to the propriety of the extent of cross-examination are always resolved in favor of cross-examination. State v. Weathers, 320 So.2d 895 (La.1975).
The fact that the State attorney who engaged in the confrontation with Fontenot at her home also conducted the cross-examination of Fontenot created a situation where his credibility was pitted against hers in front of the jury. It would have been better for the cross-examination to have been conducted by the other State attorney. This situation presented the appearance that the State attorney was expressing a personal opinion as to Fontenot's credibility by cross-examining her as to the actual events which took place in her confrontation with him. An attorney is prohibited from expressing an opinion as to a witness's credibility by Rule 3.4(e) of the LSBA Rules of Professional Conduct. The standards in the Rules of Professional Conduct for attorneys have the force and effect of substantive law. Succession of Cloud, 530 So.2d 1146, 1150 (La.1988). However, we find that defendants have failed to show that this situation caused them actual prejudice. It has not been shown that Fontenot's testimony, accepted as true and credible, was sufficient to cast reasonable doubt on the evidence against defendants as to the counts charged, none of which relate to claims for Tessie Fontenot.
Therefore, this assignment lacks merit.

Assignment 16
Defendants allege the State failed to prove proper venue in Calcasieu Parish beyond a reasonable doubt as required by LSA-C.Cr.P. art. 615. Defendants argue that, under the Medicaid Fraud Statute, LSA-R.S. 14:70.1, it is the presentment or submittal of fraudulent claims which constitutes the crime. The defendants urge that since the presentment occurred in East Baton Rouge Parish where the Medicaid claims were received and processed, the proper venue was not Calcasieu Parish.
*1277 However, from our review of the record we conclude there is substantial evidence that acts or elements of the offenses occurred in Calcasieu Parish. See LSA-C.Cr.P. art. 611; State v. McDermitt, 406 So.2d 195 (La.1981). Therefore, the State did not fail to prove proper venue.

Assignments 17, 18 & 19
Defendants contend that the State failed to prove specific intent beyond a reasonable doubt, the jury's verdicts are not supported by sufficient evidence and the trial court erred in not granting their post-verdict motion for acquittal. In reviewing the denial of a post-verdict motion for acquittal, an appellate court uses the same standard of review as in due process claims of insufficiency of evidence. State v. Smith, 441 So.2d 739 (La.1983). When reviewing the sufficiency of the evidence to support a conviction, an appellate court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant to have committed the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
LSA-R.S. 14:70.1 defines the crime of Medicaid fraud as follows:
"§ 70.1. Medicaid fraud
The crime of medicaid fraud is the act of any person, who, with intent to defraud the state through any medical assistance program created under the federal Social Security Act and administered by the Department of Health and Human Resources:
(1) Presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise; or
(2) Knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise; or
(3) Knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise.
Whoever commits the crime of Medicaid Fraud shall be imprisoned, with or without hard labor, for not more than five years, or may be fined not more than ten thousand dollars, or both."
Medicaid fraud is a specific intent crime. Specific intent is a state of mind and, as such, need not be proven as a fact but may be inferred from the circumstances of the transaction and actions of the accused. State v. McDermitt, supra.
To prove that defendants overbilled office visits as comprehensive when, in fact, a lesser level of service was rendered, testimony regarding the categories of office visits under the Medicaid billing scheme was introduced. A witness qualified as an expert in general medicine expressed his opinion, based on records seized from defendants' offices, that the office visits noted in the records were too cursory to qualify as comprehensive. Former office employees of defendants testified that defendants told them to always bill office visits as comprehensive for Medicaid patients, even after they told defendants that this was improper billing. Although Dr. Antonio Romero attempted to refute this testimony, the jury, as trier of fact, rejected his assertions and concluded that specific intent was present. On viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could have found beyond a reasonable doubt that defendants committed the crimes charged.
To establish that defendants billed for followup visits for patients released from the hospital who did not actually receive the followup services, former office employees testified that a followup visit was routinely billed and scheduled when a patient was released from the hospital. The employees testified that these bills were submitted regardless of whether the patient actually showed up for the appointed followup visit and that, despite having pointed out the problem to the defendants, defendants would not give credit for the billed visit. Documentation of the billing was presented along with office records which did not show that the patient made *1278 the followup office visit. Dr. Antonio Romero testified that he was unaware of the problem because he left all billing to his office staff because he was too busy to deal with it. Again, the jury rejected defendant's assertions and concluded that specific intent was present. Viewing the evidence in the light most favorable to the prosecution, we find there was sufficient evidence for the jury to have found beyond a reasonable doubt that defendants committed the crimes charged.
In order to prove that defendants billed phone calls from nursing home personnel as consultations, the State introduced testimony explaining that neither a telephone call nor performance of medical services by a physician on his own patient could be billed as a consultation. Former office employees testified that they told defendants that phone calls were not compensable under the Medicaid billing scheme, but that defendants insisted on continuing to bill them anyway. Dr. Antonio Romero testified that he was unaware that phone calls were not billable and that he had considered them, if lengthy, to be consultations. After carefully reviewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence to support the jury's verdicts on these counts.
To show that defendants billed telephone calls from the emergency room as emergency room visits, the State introduced the testimony of emergency room nurses who testified from their records, that phone calls were made to the defendants to notify them that their patients were in the emergency room and to obtain instructions. The nurses testified that, according to their records, defendants did not actually visit their patients in the emergency room, but only gave orders over the telephone. They also testified that the defendants could have subsequently appeared to check on the patient after they had left and thus no note of the doctor's visit would have been made by the nurse. Of the former emergency room patients called by the State to testify as witnesses, all but two stated that defendants actually did visit them or that the patient was too ill at the time to know whether or not the doctor actually visited them. The State was surprised at the testimony of four of these former patients who testified that defendants did visit them, but we note that the State produced no evidence of prior inconsistent statements to impeach their testimony. The State also introduced emergency room records and explained how the doctor's notes on the records could have been written the following day. Most of the doctor's notes do appear to have been so written. It also appears that the jury used this as a guide for conviction or acquittal on these counts. After review of this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found defendants guilty beyond a reasonable doubt on these counts.
Finally, to establish that defendants billed nursing home visits not actually rendered as consultations, the State introduced testimony by nursing home nurses to the effect that Dr. Antonio Romero did not actually visit the nursing home in January 1986. Before one of the witness nurses, Dr. Romero wrote January and February progress notes on his patients in February 1986. The testimony of the nurses, except as to the January progress notes, was not from their memories but rather from their own records, which did not indicate a January visit by Dr. Romero. However, Dr. Romero explained that, although he did visit the nursing home patients in January, he forgot to chart his visit in his records because he had just returned from a vacation and was very busy trying to catch up on work and see to all of his patients. Defendant introduced Medicaid certification forms on his nursing home Medicaid patients which have signatures, dated January 16, 1986, by both himself and Theresa Decker, the nursing director at Greenhill Nursing Home. This indicates that Dr. Romero did actually visit in January 1986. However, Dr. Romero testified that although he saw some of the patients in January, he probably did not actually visit them all, yet consultations were billed on them all. Moreover, as established in the overbilled office visit counts, Dr. Romero knew that a consultation could not be made *1279 on his own patients. Therefore, in light of this evidence, we conclude that the jury's verdicts on these counts are supported by the evidence beyond a reasonable doubt when viewed in the light most favorable to the prosecution.

DECREE
Accordingly, for the foregoing reasons, the convictions and sentences of defendant Antonio Romero on counts 6, 7, 22, 25, 35, 37, 39, 43-45, 47, 49-55, 58, 59, 61, 62, 64-66, 68-71, 73, 75 and 76 are reversed and set aside and the case is remanded for new trial in accordance with the views expressed herein. Defendant's other convictions are affirmed. Defendant Jesusa Romero's convictions are affirmed. Costs of prosecution and trial assessed to defendants are reduced as to the reversed convictions.
REVERSED IN PART; AFFIRMED IN PART; REMANDED.
KING, J., concurs in part and dissents in part for the written reasons assigned.
KING, Judge, concurring in part and dissenting in part.
I concur with the majority in their reversal of 31 of the 60 counts, or over one-half (½) of all counts, on which the defendant, Dr. Antonio Romero, was convicted. The majority reverses these convictions because of denial of due process to this defendant.
I dissent from the majority's failure to reverse all convictions of both defendants for denial of a fair trial. The defendants, both physicians, were convicted of defrauding the State on Medicaid claims of approximately $600.00 a year for three years. These alleged frauds were from alleged over-billings ranging from the smallest of $2.06 to the largest of $40.00. These claims were made on forms utilizing complex codes and terminology whose use is subject to imprecision and inaccuracy as testified to during trial. The trial judge denied the State's attempts during the trial to use certain evidence, finding the evidence unreliable and untrustworthy. We now hold that this Court's grant of emergency supervisory writs ordering the introduction of this evidence during the trial deprived the defendant of due process of law. Our finding of error in ordering admission of evidence which deprived the defendant of due process of law in over onehalf of the counts against him, and reversing his convictions on those counts, is small solace in an extremely complicated and lengthy jury trial of over a months duration. It can hardly be argued that the admission of such evidence prejudiced the defendant from receiving a fair trial on over one-half of the charges against him. The majority so holds in its decision.
In my opinion the admission before the jury of such a massive amount of untrustworthy evidence deprived Dr. Antonio Romero, and the other defendant also on trial with him, of a fair trial. The defense was essentially lack of specific intent to defraud and/or honest errors in filling out claim forms. The improperly introduced evidence was used by the State to prove specific intent to defraud. The improper admission of such a large amount of unreliable evidence in over half of the charges against one of the defendants was, in my opinion, not harmless error but error of such magnitude as to taint the entire trial and deprive both defendants of a fair trial with due process of law.
For these reasons I would reverse all convictions of both defendants and order a new trial on all counts.
NOTES
[1] § 3714. Charts or records of hospitals; admissibility of certified copy

Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the record is sought to be used may summon and examine those making the original of said record as witnesses under cross-examination.
[2] § 3715.1. Hospital and medical records; procedure In an action in which the hospital or medical physician is not a party

A. As used in this Section, the following terms shall have the respective meanings ascribed thereto:
* * * * * *
(3) "Hospital record" shall mean a compilation of the reports of various departments within a hospital or other health care facility, as well as reports from physicians attending the patient, as catalogued and maintained by the hospital or other health care facility medical record department. Hospital records do not include x-rays, electrocardiograms or like graphic matter.
[3] We refer, specifically, to Nurses Pharris, Bullock, Whitt, Nation, Cloessner and Cole.