507 So.2d 1254 (1987)
STATE of Louisiana, Plaintiff-Appellee,
v.
Dr. Charles CARGILLE, Defendant-Appellant.
No. CR86-510.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1987.
*1256 Leslie J. Schiff, Sandoz, Sandoz & Schiff, Opelousas, Guy Mitchell, Ville Platte, Thomas W. Davenport, Davenport, Files & Kelly, Monroe, for defendant-appellant.
Glen R. Peterson, Asst. Atty. Gen., Baton Rouge, for plaintiff-appellee.
Before STOKER, LABORDE and YELVERTON, JJ.
LABORDE, Judge.
Dr. Charles Cargille, defendant, was charged by bill of information with twentyfive (25) counts of medicaid fraud, a violation of LSA-R.S. 14:70.1. Defendant was tried by jury and was ultimately convicted on each count. Counts I, II, III, IV, V, VI, XI, XIV, XVI, XVIII, XXII, XXIII, XXIV, and XXV involve knowingly submitting false claims for office visit payments. Counts IX, XII, XV, and XVII involve knowingly submitting false claims for reimbursements for blood stool tests never rendered. Counts VII, VIII, X, XIII, XIX, XX, and XXI involve knowingly submitting false claims for both office visits and blood stool tests. Defendant was sentenced to serve three (3) years at hard labor and pay a fine of $3,000 on count I. The sentence was suspended and appellant was placed on probation for five (5) years. Defendant received the same suspended sentence for each of the other twenty-four (24) counts, all to run concurrently. As special conditions of his probation, appellant must pay court and prosecution costs, must perform two (2) hours per day of medical care and treatment in public agencies for a period of three (3) months, and must make restitution to the State for the sums misappropriated. Defendant originally assigned twenty-two (22) errors to the trial court and jury; subsequently, defendant consolidated or abandoned all but seven. We find that defendant's conviction was supported by the voluminous record; therefore, we affirm.
Defendant sets forth the following assignments of error:
"1. As to each count, the evidence is insufficient to support the conviction of Appellant, therefore, [sic] and the verdict is contrary to the law and the evidence. (Assignment of Error No. 1).
2. The State of Louisiana failed to comply with the provisions of Article 718 of the Louisiana Code of Criminal Procedure and the Trial Court committed error in permitting the introduction of State Exhibit 5 over the timely objection of Appellant. (Assignment of Error No. 2, 8 and 16).
3. The Trial Court erred in permitting the testimony of Mrs. Maggio relative to her opinion as to whether payment by the State of a double billing signified the State's approval of such double billing practices. (Assignment of Error No. 3).
4. The Trial Court erred in admitting evidence of other similar acts by Appellant over timely objection of Appellant. (Assignment of Error No. 9)
5. The Trial Court erred in permitting the Assistant Attorney General, Glen Petersen, to impeach and intimidate his witness, Ms. Barbara Corkern, over timely objection of Appellant. (Assignment of Error No. 13 and 14).
6. The Trial Court erred in permitting Assistant Attorney General Petersen to question Appellant relative to Appellant's receipt of payment of a bill for his patient Jagneaux, which was unrelated to the counts of the Bill of Information. (Assignment of Error No. 20).
7. The Trial Court erred in not granting a mistrial following reference to an arrest of Appellant on charges other than those involved in this prosecution. (Assignment of Error No. 22)"

ASSIGNMENT OF ERROR NUMBER 1
Defendant asserts that evidence presented at trial was insufficient to support his conviction. On appeal, to determine sufficiency of the evidence, we must ask if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found defendant guilty beyond a reasonable doubt of the offense for *1257 which he was convicted. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Chism, 436 So.2d 464 (La.1983). In this case, defendant was convicted under LSA-R.S. 14:70.1, which provides:
"The crime of medicaid fraud is the act of any person, who, with intent to defraud the state through any medical assistance program created under the federal Social Security Act and administered by the Department of Health and Human Resources:
(1) Presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise; or
(2) Knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise; or
(3) Knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise.
Whoever commits the crime of Medicaid Fraud shall be imprisoned, with or without hard labor, for not more than five years, or may be fined not more than ten thousand dollars, or both."
The gravamen of the prosecution, regarding defendant's actions, centers on subsection 2.
After graduating from Johns Hopkins Medical School in 1961, Dr. Cargille worked in various medical positions throughout the United States. In May of 1980, Dr. Cargille opened a private medical practice in Mamou, Louisiana. Dr. Cargille "inherited" the practice of a general practitioner who had recently passed away. In an effort to cultivate a wider clientele, defendant decided to enroll as a provider in the state's medical assistance program (medicaid).[1] This program allows eligible poor people[2] to receive, inter alia, twelve (12) visits to physician providers per year. The physician provider, in this case defendant, must agree to abide by a welter of rules and regulations promulgated by the program. Numerous and complex, medicaid regulations are set forth in the providers' manual. Updates are made periodically. Physician providers agree upon enrollment and on each insurance claim form to adhere to the published regulations of the program. State program workers and representatives from the state's fiscal intermediary are available for trouble shooting. The record shows that defendant became very familiar with the manual and with several of the program workers. Defendant had discussions with the program's personel over many questionable billing practices, but we will limit our treatment to the more chronic abuses.
In order to procure reimbursements from the medicaid program, physician providers must file claim forms according to a detailed code of services. Literally thousands of codes are available, but the office service section was Dr. Cargille's nemesis. When a medicaid patient is examined, the physician provider must determine which code best describes the service rendered. A continuum of codes exists, from "minimal service" to "comprehensive service." The provider is instructed to choose one basic service code. Under the "exclusions" section of Dr. Cargille's provider manual, listed are several services which are not payable under medicaid. One such exclusion is same day follow-up visits:
"[B]6. Same Day Follow-up Visits
Medical Assistance Program policy does not provide for payment of follow-up visits occurring on the same date as a previously billed visit, consultation or emergency room care.

The physician will bill for one such medical service per day and the level *1258 of care and fee billed will provide proper reimbursement for services rendered. This does not apply to hospital admissions occurring on the same date as an office visit or long term care facility visit." (Our Emphasis)
Dr. Cargille took the stand in his own defense. He testified that reimbursement for office visit service insufficiently compensated him for time he actually spent with the patient. He indicated that the low rate of pay forced him to file multiple claims for some office visits. While in direct contravention of section B(6), defendant attempted to justify his action by asserting that his billing practices are more reasonable and more equitable than that used by medicaid.[3] Initially, defendant suggested that his billing policy was based on diagnoses of the patient. Where a patient was suffering from several complex medical afflictions, defendant testified that he felt justified in billing per diagnosis. He points to an example given by Carmen DeJean Weisner, a former physician program manager, who admitted that it would be acceptable for a physician to bill for two office visits on the same day where the patient is seen in the morning for a cold, but in the afternoon for a lacerated arm. By extension, defendant reasons that two bills should also be acceptable where a patient is treated for independent afflictions during a single office visit not separated by the lunch hour. On cross-examination, Dr. Cargille stated that he did not bill for an office visit per diagnosis; to the contrary, he admitted that he billed by the amount of time he saw the patient. Defendant asserted that billing by the minute more accurately reflects the value of the physician's service. We need not comment on the relative merits of defendant's proposal for modifying medicaid's recoupment policy; however, we must determine if a reasonable jury could find that defendant filed false claims for the purpose of obtaining greater compensation than that to which he was legally entitled for furnishing his service.
Carolyn Maggio, assistant division director of medicaid, testified that same day follow-up visits, under B(6), are indeed prohibited. She also stated that defendant was well aware of the bar, but that he objected to the recoupment policy of the program. Ms. Maggio testified that medicaid's computer[4] was programed to pay thousands of claims per day to various providers. To avoid making duplicate or unauthorized payments, roughly four hundred (400) edits were programed into the system. Ms. Maggio unwaveringly stated that the lack of an edit does not validate the billing practice of a provider. For example, the program would edit the second of two brief office visits (BOV) billed by the same provider on the same day, but would not edit a comprehensive office visit (COV) and an intermediate office visit (IOV) billed for the same patient by the same provider on the same day. Ms. Maggio testified that defendant frequently billed in the latter fashion.
Lynn Dauterive, the physician program manager, corroborated Ms. Maggio's testimony. Ms. Dauterive told defendant to stop his improper billing practice and to file a written complaint with the agency if he disagreed with the policy.
Carmen DeJean Weisner, physicians program manager from June 1981 to July 1983, testified that same day follow-up visit billings were improper and that defendant knew of the prohibition. She opined that in *1259 limited circumstances, same day follow-up billings would be permissible where the diagnoses were unrelated, e.g., where in the morning the patient was seen for a cold, but in the afternoon, the patient was seen for a cut arm.
Judy Alvarado, formerly with the Surveillance Utilization and Review Unit, stated that she often explained the proper billing system to defendant. Similarly Francie Bass, a TCC field representative for providers, explained the proper billing system to defendant back in 1981. Mary Ann Petkovisik, system analysist for SDC, explained the regulation to defendant in 1983. She reiterated that there are too few edits to make the system "cheat proof." Calvin E. Payne, provider relations supervisor with SCD, also helped explain the prohibition against multiple billings for same day office visits to defendant.
Byron Davidson, an investigator for the Louisiana Department of Justice, Medicaid Fraud Control Unit, testified that he went through defendant's file and found over two hundred (200) instances where defendant double-billed medicaid for same day office visits. This was introduced to establish intent, knowledge, and system of defendant. Mr. Davidson also showed that defendant would resubmit claims under different codes when the computer edited the original code. Mr. Davidson walked through each claim defendant double-billed for office visits and each claim defendant billed for blood stool tests associated with counts I-XXV. The record shows that defendant was paid for each of these claims. Mr. Davidson also pointed out that defendant's billing practice exhausted several of his patients' twelve (12) office visit entitlements by May of the year. This left the poor people with the option of paying for additional medical services or foregoing future medical services for the majority of the year.
The jury also heard from several past employees of Dr. Cargille testifying as to his medicaid billing practice. The employees uniformily testified that defendant billed by the minute, not by the number of diagnoses.
Antoinette Hebert, defendant's former insurance clerk, stated that she was instructed by defendant to resubmit claims, initially rejected by medicaid, by changing the code until it paid off. She would routinely submit two claims when the office visit exceeded fifteen (15) minutes by billing one COV and one IOV. Ms. Hebert stated that the office workers were concerned with defendant's billing practice. Some of defendant's medicaid patients became hostile when they were told that their eligibility for out-patient service was exhausted notwithstanding the fact that they had made less than twelve (12) visits to the doctor. Ms. Hebert testified that defendant would see the ineligible patients, submit a claim for payment to medicaid, and then bill the patient either at the full or reduced rate. Ms. Hebert stated that medicaid workers admonished defendant not to double bill. To her knowledge, defendant never returned money to the medicaid system.
Rebecca Martel, defendant's former billing and insurance clerk, stated that defendant billed medicaid for more than one office visit per patient per day about one-half the time. She testified that defendant used a billing practice based on timeeach 15 minute increment equaled an office visit. If a patient was seen by defendant for twenty (20) minutes one day and for twenty-five (25) minutes the next, defendant directed the clerk to bill for three (3) office visits as the total time equaled forty-five (45) minutes. After the patient was billed for twelve (12) office visits, defendant would submit a claim for payment to medicaid and defendant would sometimes charge the patient directly.
Barbara Corkern, a laboratory worker and insurance clerk, corroborated Ms. Martel's testimony. Ms. Corkern added that defendant made her test codes to determine which ones the program would pay. She also noted that the majority of defendant's patients were on medicaid. Ms. Corkern was certain that defendant was aware of the medicaid policy against multiple billings for same day follow-up visits.
*1260 Viewing this evidence, in a light most favorable to the prosecution, a reasonable jury could have determined beyond a reasonable doubt, that defendant submitted false information for the purpose of obtaining greater compensation than that to which he was legally entitled. Defendant's intent to defraud can easily be inferred by the circumstances. See State v. McDermitt, 406 So.2d 195, 202 (La.1981). It was unreasonable for defendant to continue to bill by the minute after repeated admonitions by medicaid workers to cease. The jury reasonably found that the billing information was known to be false by defendant.
The other counts, wholly or in part, relate to defendant's submittal of claims for stool blood tests which were never completed. Defendant argues that it was reasonable for him to bill for the tests when the kits were handed out even though he knew that fifty (50%) per cent of the patients would refuse to provide a specimen. The prosecution showed that it was defendant's practice to bill for the test when the kit was given to the patient. Defendant admitted that he billed for the test before the specimen was returned; thus, before the test was completed. The state program workers offered evidence and testimony to establish that the test must have been completely rendered before properly billing for the service. Each claim form provides:
"SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed on the reverse were medically indicated and necessary to the health of this patient and were personally rendered by me or under my personal direction.
NOTICE: This is to certify that the foregoing information is true, accurate, and complete."
Defendant knew that the tests were not complete and does not attempt to show that they were completed at some later date.
The jury correctly found that defendant knowingly submitted false information, i.e., certifying that the stool blood tests had been rendered. They could reasonably infer from this false information that defendant intended to defraud the state so as to procure greater compensation than that to which defendant was legally entitled. The fact that defendant knew in advance that one-half of the tests would not be completed provided the jury with a basis for a reasonable inference that defendant intended to defraud the state.
The crime of medicaid fraud, LSA-R.S. 14:70.1, is a specific intent crime, i.e., the offender must have actively desired the prescribed criminal consequence to follow his act. LSA-R.S. 14:10(1); State v. Griffon, 448 So.2d 1287, 1292 (La.1984). Specific intent is a state of mind and, as such, it need not be proven as a fact, but may be inferred from the circumstances of the transactions of defendant. The requisite intent can easily be inferred from the overwhelming evidence against defendant. State v. McDermitt, 406 So.2d at 202. In this case, the circumstances adduced at trial indicate that defendant knowingly submitted false information to obtain greater compensation than that to which he was legally entitled with intent to defraud the state. That defendant felt justified in making multiple claims for single office visits and that defendant felt justified in billing the state for tests never completed is of no moment. Defendant's first assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 2
Defendant claims that the trial court erred in admitting into evidence certain documents which the state failed to identify, describe, or otherwise designate as those to be used at trial in contravention of defendant's discovery motion under La.C. Cr.P. art. 718. A large number of defendant's records were seized by the state prior to the institution of this prosecution. Defendant made arrangements with the state to copy documents out of this mass. When the state sought to introduce a document which defendant apparently had not copied, defendant objected to its introduction claiming that the document was inadmissible because the state had failed to point out which specific documents were to be offered at trial.
*1261 Article 718 of the Code of Criminal Procedure provides that on the defendant's motion, the prosecution shall permit the defendant to inspect books, papers, documents, or other tangible objects which are in the custody or control of the state, which are favorable to defendant, are intended for use by the state at trial or which belong to defendant. However, the state is under no duty to inform defendant how it intends to use that evidence. State v. Hines, 422 So.2d 1297 (La.App. 4th Cir.1982).
In the instant case, the record reflects that defendant had access to all documents in the custody of the state. To require the state to tell defendant what it plans to do with each document goes beyond the scope of Article 718. Defendant was given a chance to inspect and copy all documents in the possession of the state. This satisfies La.C.Cr.P. art. 718; therefore, this assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. 3 AND 5
Defendant claims the trial court erred in allowing into evidence the opinion testimony of Carolyn Maggio to the effect that medicaid payments for more than one office visit per day per patient did not constitute state approval of this billing practice; and that the trial court erred in allowing the state to impeach Barbara Corkern, one of the state's witnesses.
During the course of the trial, Ms. Maggio was qualified as an expert in the field of medical assistance programs. Ms. Maggio was asked whether, in her opinion, payments by the state for same patient, same day multiple office service claims represented the state's approbation of such billing practice. She replied in the negative.
The opinion testimony of an expert is admissible if the expert has facts upon which he can base his opinions. LSA-R.S. 15:464, 465. Ms. Maggio based her opinion on the following facts: the general policy of the state medicaid program to pay only one office visit per patient per day; and the fact that it was impossible to create a fool-proof editing program, i.e., a system which would deny all fraudulent claims.
Ms. Maggio was qualified as an expert and gave the basis for her opinion testimony. The trial judge did not err in admitting Ms. Maggio's opinion into evidence.
With regard to Ms. Corkern's testimony, defendant argues that the prosecution was impermissibly allowed to impeach Ms. Corkern by making reference to a statement that she gave to a state investigator, and by alluding to the fact that she had had discussions with the prosecutor's office concerning immunity in exchange for testifying.
Ms. Corkern was not an ebullient witness; not forthcoming were her answers to the prosecutor's questions. Eventually the prosecutor asked Ms. Corkern if she remembered talking to Byron Davidson, the state investigator. This could have been a predicate for impeachment or it could have been a predicate for past recollection recorded or for refreshing the memory of the witness. Ms. Corkern became a cooperative witness. The prosecution did not show that the witness made any inconsistent statements; the prosecutor merely tried to get the witness to answer more specifically. Even if this were considered impeachment, it was properly allowed as the state attempted to lay the proper foundation for it.
We do not consider the reference of immunity offered to Ms. Corkern to be intimidation or impeachment of the witness. When defense counsel objected to the introduction of the evidence, the district attorney responded as follows:
"BY MR. SCHIFF, Counsel for Defendant:
Objection. What would be the relevance of that, Your Honor.
BY MR. PETERSON, Assistant Attorney General:
I just asked her what they [the discussions] were. I'm going to get into the fact that we offered her immunity in this matter. I just want to bring it out right now."
*1262 The state wanted to place this evidence of possible bias in front of the jury before the defense counsel had an opportunity to do so. It was nothing more than a trial tactic designed to mitigate the anticipated damage to the witness's credibility. These assignments of error lack merit.

ASSIGNMENT OF ERROR NO. 4
Appellant claims that the trial court erred in permitting the state to introduce evidence of other acts of misconduct on the part of defendant. Appellant argues that this was nothing more than an attempt to portray him as a bad person.
As a general rule, evidence of other crimes committed by a defendant is inadmissible. However, in order to show knowledge, intent, or system, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment. LSA-R.S. 15:445, 446.
The state offered the evidence of other acts to show that defendant had adopted a system or pattern of billing the state for more than one office visit per patient per day. Although defendant admitted that this was his common billing practice, he asserted that he had no knowledge that this was against the regulations and that he had no intent to defraud the state. These other acts were offered to show this knowledge and intent. When offered for this purpose this evidence is admissible. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 6
Defendant claims that the trial court erred in permitting the state to question defendant relative to his receipt of payment of a bill on behalf of one of his patients. This policy infraction was unrelated to the counts of the bill of information.
The testimony appellant objected to concerned billings to the medicaid office for the services rendered to Mr. Kenneth Jagneaux and the receipt of private funds by defendant for the same services. Mr. Jagneaux was involved in a worker's compensation suit when he first received treatment from defendant. Defendant billed medicaid for these treatments. These treatments lasted for several years. When the case finally settled, Mr. Jagneaux's attorney asked defendant for a bill for all medical services rendered to establish medical expenses for the settlement. Payment was made to defendant for these medical expenses, defendant had previously been paid by medicaid for the services; thus, defendant was doubly paid for his service.
This testimony appears to be irrelevant to the charges in this indictment. However, this testimony was admitted into evidence without objection. Furthermore, defendant was completely able to explain the circumstances under which the payment was made.
An irregularity at trial cannot be availed of after the verdict unless it was objected to at time of occurrence. La.C.Cr.P. art. 841. Since this testimony had previously been entered without objection, defendant has no cause to complain; further testimony on the same point was harmless. The testimony did not prejudice Dr. Cargille's defense. This assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 7
Defendant claims that the trial court erred in not granting a mistrial following the prosecution's reference to an arrest of defendant on charges other than those involved in this prosecution.
The first reference to defendant's arrest came when defendant mentioned that he was arrested. This answer was volunteered by defendant; it was not in response to any question asked by the prosecutor. The state was not responsible for bringing out any information regarding defendant's arrest.
In the second instance, defendant again volunteered the information about his arrest even though such comments were not responsive to the prosecutor's questions. After this second incident, the prosecutor merely sought to clarify the situation by pointing out that defendant was not "jailed" for medicaid fraud as defendant had claimed, but for moving mortgaged property across parish lines.
*1263 In the third instance, the defendant again brought up his ancillary arrest, implying that the Attorney General's Office had "jailed" him on medicaid fraud charges, even though the answer was not responsive to the prosecutor's question. The prosecutor again established that defendant was arrested on the charge of moving mortgaged property across parish lines, not medicaid fraud. The third instance was the only time an objection was raised by defense counsel.
This testimony was not brought out by the prosecutor. The prosecutor was not attempting to establish that defendant was a bad person by presenting evidence of other crimes. The testimony was volunteered and showed that the Attorney General's Office had nothing to do with defendant's initial arrest and imprisonment.
In State v. Perry, 420 So.2d 139 (La. 1982), the Supreme Court held that a witness's unsolicited and unresponsive answer, mentioning other crimes, is not chargeable to the state to provide a ground for reversal. The trial judge did not err in refusing to grant a mistrial; therefore, this assignment lacks merit.
For the above and foregoing reasons, the convictions and sentences of defendant are affirmed.
AFFIRMED.
NOTES
[1] Each state administers its own medicaid program; however, the federal government heavily subsidizes (and regulates) the state's program. The percentage of state funding participation is based on the mean personal income of the state; in Louisiana the federal government funds twothirds (2/3) of the program. As a trade-off, the state must follow federal guidelines established by the Department of Health and Human Services.
[2] Roughly 400,000 people in Louisiana are eligible for medicaid which pays out $800,000,000 per year on the 12,000,000 accepted claims.
[3] Defendant contends that medicaid's recoupment policy promotes class struggle and contributes to invidious medical discrimination against the poor. Defendant convolutedly asserts that poor people will receive inadequate service from physicians who either (1) process patients too rapidly in order to file many claims, thus providing substandard medical care to the poor; or (2) provide standard medical care for fewer patients and file claims according to the literal regulations of medicaid, thus economically squeezing quality physicians who treat the poor out of business.
[4] Medicaid employs a fiscal intermediary to process the claims. Two fiscal intermediaries serviced Louisiana's medicaid program during defendant's enrollment: The Computer Company (TCC), and then System Development Corporation (SDC). Medicaid sets the policy while the fiscal intermediary actually programs the computer.