574 So.2d 330 (1990)
STATE of Louisiana
v.
Antonio A. ROMERO and Jesusa N. Romero.
Nos. 89-K-0037, 89-K-0038.
Supreme Court of Louisiana.
April 6, 1990.
Rehearing Denied September 13, 1990.
*331 William J. Guste, Jr., Atty. Gen., Cynthia Killingsworth, Glen Petersen, Asst. Attys. Gen., for the State.
Thomas Lorenzi, Godwin, Roddy, Lorenzi, Watson & Sanchez, Clifford Newman, Newman, Thibodeaux & Marshall, Lake Charles, Skipper Drost, Sulphur, for Antonio and Jesusa Romero.
*332 DIXON, Chief Justice.
Defendant physicians, Dr. Antonio Romero and Dr. Jesusa Romero, were charged with sixty-seven and thirty-three counts of Medicaid fraud under R.S. 14:70.1, respectively.[1] After a complicated and protracted jury trial, Dr. Antonio Romero was convicted on sixty counts and Dr. Jesusa Romero on twenty-eight counts. Defendants were convicted of making false claims totaling $1863.68. Each defendant was sentenced to five years at hard labor on each count, to run concurrently, but each was given a suspended sentence and placed on probation. On appeal, thirty-one of Dr. Antonio's sixty convictions were reversed.[2]State of Louisiana v. Romero, 533 So.2d 1264 (La.App. 3d Cir.1988). The remaining twenty-nine counts were affirmed, as were all of Dr. Jesusa's convictions. Both the state and the defendants are before this court on writs. State of Louisiana v. Romero, 541 So.2d 879-80 (La.1989).
The Romeros, husband and wife, originally from the Philippines, were practicing medicine in Akron, Ohio, when DeQuincy Memorial Hospital contacted them in 1980 and asked that they relocate in Louisiana. Inducements included staff positions at the hospital and assistance in setting up their practice. In return, the Romeros were required to enroll in the Louisiana Medical Assistance Program (Medicaid) and to accept Medicaid recipients as patients. Enrollment consists of a contract between the medical provider, such as defendants, and the state, whereby the provider agrees to abide by all state and federal regulations, including billing procedures.
Upon enrollment, a physician is issued a provider manual which contains the rules and regulations of the program, provides details on what is and is not covered by the program, and contains instructions on completing and submitting claims forms.[3] The provider manual directs physicians to use certain codes found in Current Procedural Terminology (CPT) books printed by the American Medical Association. CPTs are used for billing purposes and provide the codes used in making a claim, such as billing procedure codes, diagnosis codes, service codes, and unit codes.[4] Not all of the codes listed in the CPT books have been adopted by the Medicaid system and the provider manuals do not indicate which CPT codes are used in Medicaid, but provide only a broad description of what is covered.
Medicaid neither covers all medical services and treatment, nor does it interact directly with providers. Instead, Louisiana contracts with private companies to act as its fiscal intermediary for claims processing, disbursement and direct contact with providers.[5] Medical providers submit *333 claims for payment to the fiscal intermediary and, if approved, the intermediary issues a check to the provider. The provider must use the appropriate codes and information from the identification cards presented by eligible Medicaid recipients. The claims form is first submitted to the recipient's primary health insurer, if any, and then the claim is transferred, or "crossed over," to Medicaid's fiscal intermediary. Each claim is assigned an internal control number (ICN). The status of each claim form submitted is reflected in remittance advice statements sent to providers. On these statements appear the patient's name, the date of service, the procedure code for the service rendered, the ICN and information advising whether the claim is approved, rejected or held. Payment checks are accompanied by remittance advice statements, which in addition to the information above, include date of payment, the amount paid and the check number.
It is the state's contention that the defendants committed acts of Medicaid fraud in 1983, 1984 and 1985, through the following billing schemes: (1) over billing office visits by billing for a comprehensive visit when a lesser level of service was rendered; (2) billing for follow-up visits for patients released from the hospital, although the services were never rendered; (3) billing for visits to patients at Greenhill Nursing Home, which were never made; (4) billing for emergency room visits when telephone orders had been given; and (5) billing telephone calls as consultation.

Greenhill Documents
In their first assignment of error, both the state and defendants address the admissibility of medical records obtained from the Greenhill Nursing Home. The state introduced these documents at trial to prove Dr. Antonio committed Medicaid fraud by submitting claims for medical services to Greenhill residents which he never provided. The documents were charts compiled to record the progress of Greenhill patients and consisted of nurses' notes, progress notes, physician order sheets and doctors' orders sheets. The state called Theresa Decker, the custodian of the documents, to testify; she maintained that all pertinent information concerning a patient was contained in these documents, including entries documenting all doctor visits. The state asserted that the absence of such an entry would establish that Dr. Antonio did not make patient visits for which he billed Medicaid.
The admissibility of the documents is governed by the hearsay rule and exceptions to that rule. At the time of trial, hearsay was defined jurisprudentially.
"`Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter. C. McCormick, Evidence, § 246 (Cleary ed. 1972).'" State v. Shoemaker, 500 So.2d 385, 388 (La.1987); State v. Martin, 356 So.2d 1370, 1373-74 (La.1978).
The defense objected to the introduction of these documents as hearsay, while the state maintained they fell under exceptions to that rule and were therefore admissible. The extent of the confusion and controversy surrounding these documents is illustrated in the lower court rulings with respect to this evidence.
Initially, the trial court excluded these documents, stating that they were unreliable and untrustworthy. The state applied for writs and the court of appeal reversed and set aside the trial court ruling, stating that defendants' objections were more properly addressed to the weight to be accorded the evidence. State v. Romero, 533 So.2d 1264 (La.App. 3d Cir.1988). This court subsequently denied defendants' writs, reserving to defendants the right to raise the issue if convicted. State v. Romero, 514 So.2d 467 (La.1987). The trial court then permitted the introduction of these documents under the business records exception to the hearsay rule.[6] On *334 appeal, the court of appeal held that the admission of this evidence under the business records exception was improper. To establish a foundation for the admission of the Greenhill documents as business records, the state was required to show that the persons who made these records were genuinely unable to testify. State v. Monroe, 345 So.2d 1185 (La. 1977). The court of appeal concluded that the state failed to show this, thereby failing to establish the proper foundation for the admission of this evidence. As a result, many of the Greenhill convictions were reversed. The court of appeal further held that although these documents were not admissible as business records, they could have been admitted under the hospital records exception to the hearsay rule, R.S. 13:3714 and 13:3715.1.
The state now contends that the appellate court erred because prosecutors satisfied all foundation requirements for admissibility under both the business records and the hospital records exception to the hearsay rule. It is the unreliability and untrustworthiness of the Greenhill documents which render them inadmissible, thus the distinction between hospital and business records is irrelevant.
Hearsay evidence is inadmissible except under one of the statutory or well recognized exceptions. State v. Broussard, 391 So.2d 1167 (La. 1980); State v. Sheppard, 350 So.2d 615 (La. 1977); R.S. 15:434. Policy considerations underlying the traditional exclusion of hearsay at criminal trial relate to the reliability of the unsworn statement and potential prejudice to the accused in permitting a damaging out-of-court statement which cannot be tested for its basis in fact. State v. Arnold, 367 So.2d 324, 326 (La. 1979); State v. Ford, 336 So.2d 817 (La. 1976). Reliability and trustworthiness of hearsay evidence must be established before it may be admitted into evidence. "In all conceivable exceptions to the hearsay rule, the trustworthiness of the evidence is the primary criterion for admissibility." State v. Trull, 382 So.2d 960, 962 (La.1980). (Emphasis added).
Various factual findings lead to the conclusion that the Greenhill documents are untrustworthy. The foundation for the admission of these documents into evidence was established by Theresa Decker, the custodian of the documents and director of nursing at Greenhill Nursing Home. Decker, testifying for the state, recounted that the nursing staff was instructed and required to document in nurses' notes all pertinent information about a patient, including when a patient left on pass and returned, and when a patient was visited by a doctor. The nurses' notes were attached to a patient's charts and these charts were kept in the nurses' station. Decker testified that she had standing instructions with the staff to notify her whenever a doctor made rounds. She was on twenty-four hour call to the nursing home. Further testimony from Decker and other Greenhill nurses revealed glaring deficiencies in these documents.
The most critical deficiency in this documentation is evident in the manner by which the patient files were compiled. Under cross-examination, Decker acknowledged that she routinely removed patient charts to her office and occasionally took them home overnight so that they might be "thinned." By this she meant that pages of nurses notes, progress notes, physician order sheets, and doctors' orders sheets were regularly culled from patient charts when those charts became too thick. The documents were removed and placed in separate files which the state failed to present at trial. Decker also testified that other *335 reports, patient plans, medication orders and monthly summary sheets were not provided at trial. The state thus attempted to prove a physician's absence with incomplete documentation.
The method of recordation of medical information used at Greenhill also renders these documents unreliable. During testimony from eight licensed practical nurses (LPNs), all current or former employees of Greenhill, inconsistencies and contradictions were exposed concerning the patient records which undermined the integrity and reliability of these records.
LPN Bonnie Cryer acknowledged that patient charts were missing occasionally from the nurses' station. Her practice was to take notes, record patient information in "jot books," and later transcribe that information to the patient charts when found.[7] LPN Eva McQeen stated the charts would be missing for no more than a couple of weeks and would often turn up in another patient's charts. Her practice was to begin a new page of nurses' notes, patient's chart, or whatever was required. LPN Peggy Bell never received instructions as to what should be recorded in nurses notes. In direct contradiction to Decker, she stated that there was neither procedure nor requirement to notify Decker when a doctor made rounds. She used "jot books" when patient charts could not be found. LPN Bernice McCoy testified that nurses' notes were not kept with the patient charts, but in a cardex at the nurses' station. LPN Judith Littlejohn stated that patient charts were not carried on rounds with doctors, but that she would take notes on a separate piece of paper and later transfer them to the nurses' notes. LPN Lisa Bushnell testified that no one was responsible for the "sign out" book that patients were to fill in when they left or returned to the premises. LPN Elsie Ramos stated that missing charts were usually found in Decker's office. Ramos' practice was to take notes in the "jot book" or in a pocket notebook she carried. Finally, LPN Shirley Myers testified that charts were missing at times; that sometimes they could be found in Decker's office; and that sometimes they could not be found at all. When this happened, it was her practice to begin with a new page of nurses' notes.
These documents have striking shortcomings, as established through nurses' testimony and on the face of the documents themselves. The staff had wide discretion with respect to entries made in nurses' notes. The notes bore numerous strike overs and errors as to times, dates, even years. Some notes, which were introduced to prove that Dr. Antonio was absent on a given day, would cover up to a five and one-half month time period on one side of a sheet of paper, with an entire month separating entries.
When combined with the disappearance of patient charts for extended periods of time, this evidence casts grave doubt upon the reliability of the notes and clearly establishes them as untrustworthy.
In determining whether erroneous admission of evidence requires reversal of a defendant's conviction, the proper standard is whether there is a reasonable possibility that the evidence might have contributed to the verdict, and whether the reviewing court is prepared to state beyond a reasonable doubt that it did not. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Walters, 523 So.2d 811 (La.1988); State v. Green, 493 So.2d 1178 (La. 1986); State v. Gibson, 391 So.2d 421 (La.1980).
In counts involving the Greenhill documents, the state relied on the correlation of dates and entries in these documents to establish that Dr. Antonio did not make the nursing home visits claimed. These records and testimony from its authors were the only evidence introduced on these counts. It is clear that without the Greenhill documents, there is insufficient evidence to support convictions on these counts. Accordingly, and for reasons stated above, all counts involving the introduction *336 of Greenhill documents are dismissed: Counts 6, 7, 22-27, 35-47, 49, 51-55 and 57-78.
Defendants would have us extend this ruling and reverse all convictions, arguing that the admission of these documents was so prejudicial as to require reversal on all counts. The state has presented independent evidence on the remaining counts sufficient to support those convictions. Dr. Jesusa was never linked to the Greenhill documents, nor did the state attempt to use those documents in any of the counts against her. None of the remaining counts against Dr. Antonio involved these records, nor were they introduced to support any conviction other than those already dismissed. There is no reasonable possibility that the introduction of the Greenhill documents contributed to the convictions on the remaining counts against Drs. Antonio or Jesusa Romero.

Other Crimes
Defendants assert that the trial court erred in admitting evidence of "other crimes" at trial. In an attempt to prove specific intent, the state introduced evidence of billing improprieties, or other crimes, by the Romeros with non-Medicaid patients. The state introduced this evidence under the authority of R.S. 15:445 and 15:446.
"In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction." R.S. 15:445.
"When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged." R.S. 15:446.
Before evidence of other crimes is admitted as proof of intent, three prerequisites must be satisfied: (1) the prior acts must be similar, (2) there must be a real genuine contested issue of intent at trial, and (3) the probative value of the evidence must outweigh its prejudicial effect. State v. Kahey, 436 So.2d 475, 488 (La.1988).
By introducing evidence of similar billing improprieties with non-Medicaid patients, the state demonstrated a systematic practice followed by the Romeros which was highly relevant to the question of intent to defraud, a material issue at trial. The state advised defendants before trial of its intent to show knowledge, system and intent in connection with specified patients of defendants. The defendants requested and received jury instruction on the purpose for which this evidence could be received, thus minimizing the prejudicial effect of such evidence. The trial court did not err in allowing the introduction of this evidence into the record.

Rebuttal Witnesses
Defendants contend that the state's failure to call rebuttal witnesses deprived them of their right to confrontation, cross-examination, due process and a fair trial. Amy Fontenot was called as a witness by the defense. She testified that Dr. Antonio had treated her non-ambulatory daughter in the parking lot of their offices, rather than require that she be brought inside. She stated that she was visited at home by one of the state's attorneys but that she ordered him to leave and threatened to call the police after he called her a liar. She was then cross-examined by Glen Petersen, the same state's attorney complained of. He sought to impeach her by demonstrating that she had lied on direct examination and that her ability to recall details of her conversation with state investigators was poor. The state requested that all investigators with whom Fontenot had contact be sequestered so they could later be called on rebuttal, if needed. The state did not call any witness to rebut her testimony. Defendants now contest the state's failure to do so.
*337 The prosecution has the right to rebut evidence adduced by the defendant at trial. State v. Williams, 445 So.2d 1171 (La. 1984); R.S. 15:282. In a criminal prosecution the state does not and cannot know what evidence the defendant will use until it is presented at the trial of the case. It is for this reason that the state is given the right of rebuttal. State v. Monroe, 205 La. 285, 17 So.2d 331 (1944). The presentation of rebuttal witnesses is the state's right. The prosecution is under no obligation to call rebuttal witnesses. This argument is without merit.

Improper Cross-Examination
Defendants allege that the scope of the state's cross-examination was improper and, more particularly, that Petersen should not have conducted the cross-examination of Fontenot, for by doing so he cast her credibility in direct conflict with his. Although care should be exercised not to exceed the proper bounds by impeaching a witness as to collateral facts or irrelevant matters under R.S. 15:494, mere doubts as to the propriety of the extent of the cross-examination are always resolved in favor of the cross-examination. State v. Weathers, 320 So.2d 895, 898 (La. 1975), citing State v. Bertrand, 167 La. 373, 119 So. 261 (La.1928). Although it would have been preferable for the state to cross-examine Fontenot with someone other than Petersen, the defendants fail to show, nor is there any indication from the record, that this caused any prejudice whatsoever. Fontenot's testimony went uncontradicted and was accepted as being truthful and credible. This assignment is without merit.

Evidence of Specific Intent
In their final assignment of error, defendants contend that the prosecution failed to prove guilt beyond a reasonable doubt, particularly the requirement of specific intent.
Medicaid fraud is a specific intent crime. Specific intent is a state of mind, and, as such, need not be proved as fact, but may be inferred from the circumstances of the transaction and actions of the accused. State v. McDermitt, 406 So.2d 195 (La.1985); State v. Williams, 383 So.2d 369 (La.1980).
The federal constitutional standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
To prove that defendants billed for comprehensive office visits when lesser services were rendered, the state presented a qualified expert, Dr. Henry Rothchild, a professor of medicine at Louisiana State University Medical School with a private practice in internal medicine and geriatrics, who testified about notes taken by the Romeros during each questioned visit. It was his expert opinion that the notes were clearly deficient and did not reflect a comprehensive office visit. Further testimony from nurses at the Romeros' office established that they were instructed by the Romeros to always bill office visits as comprehensive office visits, regardless of the services actually rendered. This was true even after the nurses told the doctors that this procedure was improper. One comprehensive visit charge was established independently of Dr. Rothchild's testimony. This involved a comprehensive office visit billed to Zenia Dove. The state proved through testimony of office nurses and Dove's caretaker that Dove never visited their office because she was bedridden. The caretaker also stated that Dove was never visited by either doctor. Viewing the evidence in a light most favorable to the prosecution, the jury could have found the defendants guilty beyond a reasonable doubt on the counts involving comprehensive office visits.
The state also proved that defendants billed Medicaid for follow-up office visits after a patient's release from the hospital, although the follow-up visit never occurred. One count against Dr. Antonio and two counts against Dr. Jesusa involved alleged follow-up visits provided to Dove. *338 Again the state introduced testimony by Dove's caretaker and nurses to prove that these services were never provided. To prove a final follow-up visit count against Dr. Jesusa, the state introduced into evidence records from Humana Hospital of Lake Charles and DeQuincy Memorial Hospital. Dr. Jesusa billed Medicaid for a follow-up office visit of a patient who was still hospitalized, according to those records. On this evidence the jury could have found specific intent beyond a reasonable doubt.
To prove that the defendants billed for emergency room visits which they never made, the state produced testimony from emergency room nurses who testified from their notes. All testified that their notes would have indicated a visit from the doctor, yet no notation of such a visit existed. The state also established, through emergency room nurses' testimony, that both doctors made a practice of calling in phone orders to the emergency room and billing those calls as emergency room visits. A reasonable person would know that a telephone call would not be a proper substitute for an emergency room visit, and therefore should not be billed as one. On this evidence, in a light most favorable to the state, the jury could have found specific intent beyond a reasonable doubt.
Finally, we address the question of specific intent with respect to the counts in which the state proved the defendants improperly billed telephone calls as consultations. The state had Department of Health and Human Resources Assistant Director for Medicaid, Carolyn Maggio, testify. She stated that providers were required to become familiar with their provider manual. This manual contains the rules, regulations and definitions of the program; provides details on what is and is not covered; and contains instructions on completing and submitting forms. Maggio testified that this manual prohibits billing of telephone calls and that a consultation requires "hands on" contact by the provider/doctor, or at least, "face to face interaction." The state introduced a looseleaf binder seized from the Romero clinic, although it was never determined to be a complete provider manual. This manual provides that all coding used in claim forms was to be taken from Current Procedural Terminology (CPT) books. Having reviewed the provider manual in the record, we find nothing in it that supports the assertion that phone calls may not be billed as consultations. On the contrary, the CPT books tend to support the defendants' position. We found that all of the CPT books provided procedure codes for telephone consultations.[8] Therefore, a provider, relying on the provider manual and the CPT books, could reasonably conclude that telephone consultations could be billed to Medicaid. The state did, however, establish through testimony and through the provider manual, that providers could not "consult" their own patients. The following definition of consultation is found in the provider manual:
"The Medical Assistance Program defined a consultation when a physician's opinion or advice is requested by another physician or other appropriate source in order to aid the referring source in evaluating or managing the patient.
The consulting physician must enter the referring physician's name in Item 19 of the claim form when billing for a consultation service.
Physician visits should not be billed as a consultation when:
The physician has already seen the patient on a recent consultation for the same condition.

*339 The physician has recently provided medical care to the patient as treating physician.
The physician intends to follow the patient and will be billing as a treating physician for subsequent medical care." (S-118, p. 4-20).
The medical records of all telephone consultation patients were entered into the record by the state. These clearly establish that Dr. Jesusa and Dr. Antonio had recently provided medical care to each of these patients as treating physician, and that they intended to follow each patient as a treating physician for subsequent medical care at the time of the consultation. Viewed in a light most favorable to the prosecution, this evidence establishes that the jury could have found beyond a reasonable doubt that the doctors had the requisite intent to defraud Medicaid.

Costs
The state contends that the appellate court erred in proportionately reducing costs assessed against defendants as to the convictions reversed on appeal. This issue is now moot since those convictions, and others, have been dismissed. A defendant who is convicted of an offense is liable for all costs of the prosecution or proceedings, but a defendant is not liable for costs if he is acquitted or if the prosecution or proceeding is dismissed. C.Cr.P. 887 A. Accordingly, no costs will be assessed to defendants on any convictions dismissed on appeal or by this court.
For reasons assigned, the following counts against Dr. Antonio Romero are dismissed: Counts 6, 7, 22-27, 35-47, 49, 51-55 and 57-78. The convictions and sentences on his remaining counts are affirmed: Counts 1, 2, 3, 4, 5, 8, 21, 28, 29, 30 and 33. Dr. Jesusa Romero's convictions and sentences are affirmed.
CALOGERO, J., dissents for reasons assigned by WATSON, J.
WATSON and LEMMON, JJ., dissent and assign reasons.
WATSON, Justice, dissenting.
The majority errs in applying the harmless error test to the facts in this case. When the court of appeal ruled that the unreliable Greenhill documents could be presented to the jury, it opened the door to impermissible other crimes evidence in violation of LSA-C.Cr.P. art. 770(2).
The harmless error standard applies when the prosecution presents inadmissible evidence in support of a criminal charge. In order to uphold a guilty verdict, the appellate court must determine that there is no reasonable possibility that the erroneous introduction of the evidence contributed to the conviction of the defendant. State v. Gibson, 391 So.2d 421 (La.1980)[1]; State v. Green, 493 So.2d 1178 (La.1986).[2]
The harmless error standard does not apply to other crimes evidence. When a judge, district attorney or court official refers directly or indirectly to "another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible," a mistrial is mandatory. LSA-C.Cr.P. art. 770(2). Denial of a requested mistrial after an allusion to other crimes is per se a substantial violation of a statutory right. State v. Green, 315 So.2d 763 (La.1975); State v. Andrews, 527 So.2d 411 (La.App. 4th Cir.), writ denied, 532 So.2d 176 (La.1988). See also State v. Perry, 420 So.2d 139 (La.1982); State v. Nuccio, 454 So.2d 93 (La.1984).[3]
*340 In the trial of Dr. Antonio Romero and Dr. Jesusa Romero, the state presented evidence of 100 counts of alleged medicaid fraud; evidence on 52 of the counts, those related to improper practices at the Greenhill Nursing Home by Dr. Antonio, was inadmissible for lack of trustworthiness. The defendants objected to this evidence.[4] Notwithstanding these objections, the jury heard extensive discussion of 52 other crimes that the Romeros were alleged to have committed. Reference to even one other crime would be unfairly prejudicial, suggesting that the Romeros were of bad character and likely to have the intent necessary to cheat the Medicaid system. The cumulative effect of 52 other crimes is an extreme example of the harm reprobated by LSA-C.Cr.P. art. 770(2). The fact that Dr. Jesusa was not involved in the Greenhill allegations is immaterial. As the co-defendant and spouse of Dr. Antonio, Dr. Jesusa was prejudiced by implications of an all-pervasive family scheme.
Even if the harmless error test were the appropriate standard in this case, the majority errs in concluding that there is no reasonable possibility that the introduction of the Greenhill documents contributed to the convictions of Dr. Antonio and Dr. Jesusa on the other counts. The problem here is not one leather jacket or one gun that is not needed to prove any essential element of an alleged crime but an enormous amount of untrustworthy information that goes to the central issue of criminal intent. As Judge King explained in his dissent:
The improperly introduced evidence was used by the State to prove specific intent to defraud. The improper admission of such a large amount of unreliable evidence in over half of the charges against one of the defendants was, in my opinion, not harmless error but error of such magnitude as to taint the entire trial and deprive both defendants of a fair trial with due process of law.[5]
Other crimes evidence is not the only disturbing aspect of this trial. A criminal statute is unconstitutionally vague if it does not give adequate notice that certain conduct is proscribed and punishable by law; it must describe the unlawful conduct with sufficient particularity and clarity that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto. State v. Azar, 539 So.2d 1222 (La.1989); State v. Pierre, 500 So.2d 382 (La.1987).
The crime of medicaid fraud is defined very generally by LSA-R.S. 14.70.1. Doctors violate the statute when "with intent to defraud," they make "any false or fraudulent claim for furnishing services or merchandise." To know what constitutes an improper or fraudulent claim, doctors must consult the "Provider Manual." The Department of Health and Human Resources (DHHR) writes the provider manual. A private company acts as a fiscal intermediary between DHHR and the health care providers.[6] The fiscal intermediary is responsible for distributing the manuals, as well as processing claims and disbursing payments. There was mass confusion in the offices of the fiscal intermediary. Doctors waited months for provider manuals. Dr. Antonio said that he and his wife did not have a manual until 1985; they used the one they brought from Ohio.[7] Calvin Payne, a supervisor for the fiscal intermediary, thought the Romeros had more than one manual. He conceded, however, that he frequently had calls from people who said they did not receive their manuals. Lynn Anderson, a field representative *341 for the fiscal intermediary, thought she left two provider manuals at the Romero clinic, but explained under cross-examination that she left them if she had them with her. If not, she called the Baton Rouge office and asked to have one mailed.[8]
The provider manual was frequently updated or changed, presenting an additional distribution problem.[9] The state seized a provider manual from the Romeros' office. However, DHHR officials involved in supervision of the Medicaid program were unable to testify whether this manual was complete. Similarly, they were unable to show a complete and up-to-date manual or state what such a manual would contain.
Doctors were advised by the provider manual to consult the AMA's publication on Current Procedural Terminology for billing codes and levels of service. For example, the 1986 CPT lists codes for 11 different levels of office visit. Carolyn Maggio, DHHR's assistant director for Medicaid, admitted that the provider manual neither indicates which CPT codes are used by Medicaid nor provides more than the broadest definition of what is covered. It does not define visit, much less comprehensive office visit, emergency room visit, or nursing home visit. Notwithstanding Maggio's contrary assertion, the provider manual does not prohibit billing for telephone services. While the state alleged "fraudulent practices,"[10] the Romeros could not determine from the provider manual, the CPTs or the Medicaid Fraud Statute that they were in violation of the rules.
There is no rule in the provider manual forbidding billing for telephone calls. The CPT, on the other hand, lists codes for several levels of telephone services.[11] The Romeros' conduct conforms to the CPTs. They did not bill for simple telephone calls to check up on patients; they submitted claims only if a call was prolonged and involved decisions or instructions about medical treatment. Carolyn Maggio attempted to overcome the lacuna in the written regulations, asserting that everyone knew there was a hands-on requirement for billing purposes and that a telephone call would not suffice.[12] Due process, however, requires a written notice. "A crime is that conduct which is defined as criminal in this Code, or in other acts of the legislature, or in the constitution of this state." LSA-R.S. 14:7.
The telephone may have created the Romeros' problems with emergency room billings as well. The state charged that Antonio and Jesusa Romero billed for emergency room visits at DeQuincy Memorial Hospital which they did not make. The records of most of the ER patients were marked "PO," indicating that the doctors had given their initial orders over the phone rather than in person. Antonio Romero explained that these patients arrived while he was working in another part of the hospital. The ER staff paged him; he listened to the problem and gave immediate instructions over the phone. As soon as he finished his task, he visited the patient. He never changed the "PO" indication because he did not think it mattered. He took responsibility for his patients' treatment. He ordered appropriate tests or treatment and saw them as soon as possible or as soon as necessary.[13] The prosecutors called 6 ER patients to substantiate this charge. To their surprise, 3 of these witnesses corroborated Romero's *342 story. They said he did visit them after the initial report was filled in. A fourth patient, Pat Foshee, was "not sure" whether Antonio Romero visited her after the ER called him; she said he had failed to do so on other occasions, however.[14] Pam Sparks said that Antonio Romero visited her on the following day.[15]
The state called Dr. Henry Rothchild to prove that the Romeros did not provide enough service to qualify for the level of payment afforded "comprehensive office visits." Rothchild estimated that such a visit should take 30 minutes and produce a large quantity of notes. He observed that the Romeros' notes were cursory. The 1986 CPT definition of COV does not specify a length of time or a quantity of notes. It explains that this category of service "provide[s] an in-depth evaluation of a patient with a new or existing problem" and "includes the recording of a chief complaint or complaints and present illness, family history, system review, a complete physical examination, and an ordering of appropriate diagnostic tests and procedures."
Although the CPT lists 11 different levels for office visit, even Dr. Rothchild did not make use of all the distinctions. He testified that he routinely used only 3 different levels (minimal, extended, brief) in making Medicaid claims.[16] Rothchild admitted that he had never practiced in a rural community. Romero asserted that in DeQuincy (population 3,966 in 1980 Census), he saw patients regularly and knew a great deal about their personal and family histories. Due to personal preference and the nature of his practice, he talked with patients extensively each time he saw them. He was not a big note-taker.
Another layer of confusion was added by the system of computer edits. The fiscal intermediary ran each Medicaid claim through a computer to check for repetitive claims, unauthorized services, and ineligible participants. There were 300 to 400 edits in the computer; DHHR changed them constantly. One week a CPT could be payable and the following week it could be disallowed.[17]
The Medicaid claim rejection slip contains procedure codes, diagnosis codes, 11-digit codes identifying the patient, codes indicating that the claim has been rejected or adjusted, and codes explaining the reason for the rejection. The Romeros accumulated hundreds of these rejection slips; there were stacks in their business office. They frequently asked DHHR and the fiscal intermediary for help, but as late as 1985, they were still trying to sort out problems from 1982.[18]
The Romeros were not the only doctors who experienced difficulty with the system. Carolyn Maggio admitted that the Medicaid System was a nightmare from 1981 to 1983.[19] Milton Bellard, managing director of the Bayou Comprehensive Medical System in Lake Charles, testified that it took him 3 to 6 months to get a provider manual. He made repeated requests, but each time the fiscal intermediary claimed that one had already been sent. From 1981 to 1985, 50% to 70% of the BCMC claims were denied.[20]
Carolyn Maggio claimed that DHHR corrects misunderstandings about the regulations before seeking a criminal indictment against a health care provider.[21] In the case of the Romeros, no Medicaid representatives testified that they had warned the Romeros against billing for telephone services, giving phone orders for emergency room patients, or using the comprehensive *343 level for all office visits. On the contrary, the testimony established that the Romeros had enormous problems with the billing system, that their office personnel were uncertain how to handle some of the "gray areas,"[22] that they did not know the proper way to bill for follow-up visits until November 1985 or for consultations until April 1986, the month when the criminal investigation began.[23]
Nor do the Romeros seem to have been willfully ignorant. They frequently sent their staff to billing seminars and asked representatives to come to their office to help resolve their problems. Agnes Holloman, a field representative for the fiscal intermediary, went to the Romero clinic unannounced in March 1984. She found them appreciative and cooperative; they freely showed her their records. She acknowledged that they were confused and that phone calls to the fiscal intermediary would have been of absolutely no help given the scope of their problems.[24] Dr. Antonio denied trying to abuse the system: "Nobody told me about anything that was illegal. I tried my best ... to find out what was wrong but nobody came down [who could ever] ... point it out to me."[25]
Because of the confusion in the billing system, doctors and/or the fiscal intermediary could easily make mistakes in the claims. Indeed, it seems likely that in the period from 1981 to 1985 the Romeros lost more in unpaid claims than they are alleged to have misappropriated.[26] Under these circumstances, it cannot be said that the laws described unlawful conduct with such particularity and clarity that ordinary men of reasonable intelligence would be capable of understanding and avoiding this conduct. Criminal convictions based upon such laws violate due process of law.
Constitutional violations deprived these two defendants of a fair trial. I respectfully dissent.
LEMMON, Justice, dissenting in part.
The clear insufficiency of the evidence requires discharge of defendant Antonio Romero on the Greenhill Nursing Home counts. Vast amounts of this evidence (introduced under an order of the court of appeal after the trial judge found the evidence to be untrustworthy) were presented to the jury, along with evidence of other payments in large amounts which were not relevant to any charges in this case.[1] Under these circumstances I cannot say that these arbitrary factors did not influence the jury's decision on the problematical evidence of intent to defraud on the remaining counts.
I therefore dissent from the court's refusal to grant a new trial on Counts 1, 2, 3, 4, 5, 8, 21, 28, 29, 30 and 31 against defendant Antonio Romero and on all counts against defendant Jesusa Romero.
NOTES
[1] "A. The crime of Medicaid fraud is the act of any person, who, with intent to defraud the state through any medical assistance program created under the federal Social Security Act and administered by the Department of Health and Hospitals:

(1) Presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise; or
(2) Knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise; or
(3) Knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise.
B. Whoever commits the crime of Medicaid fraud shall be imprisoned, with or without hard labor, for not more than five years, or may be fined not more than ten thousand dollars, or both." R.S. 14:70.1.
[2] The court of appeal reversed the conviction and ordered a retrial on Count 50; however, according to the verdict order form, the jurors acquitted Dr. Antonio on that count.
[3] While it is unclear from the record when the Romeros received their provider manual or whether they ever possessed an updated provider manual, it is clear that they had significant problems in obtaining one and had to make numerous requests to the fiscal intermediary before receiving one.
[4] Each different service and diagnosis rendered must be itemized in code on the claim. For example, there are eleven gradations of "office visit" listed in the CPT (1986), with five levels of service for new patients and six for established patients. There are also hundreds of diagnosis codes.
[5] Although written by the Department of Health and Human Resources, the fiscal intermediary has the responsibility to print and distribute provider manuals, as well as updates and revisions.
[6] This court has fashioned the following formula for the admission of business records:

"A permanent record made in the ordinary course of business, by a person unavailable for testimony, from personal knowledge of the facts recorded or from information furnished by one having a business duty to observe and report the facts, ..." State v. Monroe, supra at 1188.
The Monroe court cautioned that business records could be admitted as proof of their assertions only if the state proved "that the person who made the record is genuinely unavailable for testimony, that he has no strong motive to misrepresent, and that in all probability the evidence is trustworthy." State v. Monroe, supra at 1190.
[7] "Jot books" were used by nurses as a supplement to shift reports to convey information omitted in reports. Decker stated that these notebooks were used as ancillaries to nurses' notes.
[8] The following codes were found in CPT (1985) at Medicine, p. 41:

"99013 Telephone call for consultation or medical management; simple or brief (eg, to report on test and/or laboratory results; to clarify or alter previous instructions; to adjust therapy)
99014 intermediate (eg, to provide advice to an established patient on a new problem; to initiate therapy that can be handled by telephone; to discuss results of tests in detail)
99015 lenthy or complex (eg, lengthy counseling session with anxious or distraught patient; detailed or prolonged discussion with family member regarding seriously ill patient)"
[1] The Gibson court determined that a nondescript leather jacket obtained through illegal search and seizure did not taint the trial because the other evidence connecting defendant to the armed robbery was incontrovertible.
[2] In Green, a trial court erred in forcing an attorney to authenticate a gun, in violation of the attorney-client privilege. However, the defendant admitted that he shot the victim. "The gun in no way was necessary to link Green to the shooting nor was it necessary for proof of any element of the crime of attempted manslaughter. There is no reasonable possibility the introduction of the gun in any way contributed to the conviction." Id. at 1186.
[3] Green was granted a new trial because the prosecution said to a witness, "Was that before or after he [Green] got out of the penitentiary?" Green, 315 So.2d at 764. In Andrews, the DA "prejudiced [the defendant] by leaving the jury to speculate upon other crimes or deplorable misdeeds [he] might have committed." Andrews, 527 So.2d at 414.
[4] The trial court sustained the objection, but the court of appeal overruled the trial court. This court denied writs, 524 So.2d 467 (La.1987). In this procedural posture, it was not necessary that the Romeros actually seek a mistrial. Instead they appealed the convictions.
[5] State v. Romero, 533 So.2d 1264, 1279 (La. App. 3d Cir.1988).
[6] From January 1981 to December 1983, the fiscal intermediary was The Computer Company. After January 1984, Systems Development Corporation took over. The name of SDC was later changed to Burroughs and then to Unisys.
[7] Tr. 3194-98.
[8] Tr. 3396-3409.
[9] Payne testified that the manual was revised 7 times in 1984, 4 times in 1986, and 2 times in 1987; he could not say how many times it was revised before 1984.
[10] The alleged fraudulent practices included the following: (1) billing telephone calls as consultations; (2) billing for emergency room visits when orders were given by telephone; (3) billing surgery patients for follow-up office visits whether they came or not; (4) billing for "comprehensive office visits" when a lower level of service was rendered.
[11] For example, 1986 CPT at p. 41 provides: "Code 99013: Telephone call for consultation or medical management; simple or brief (e.g. to report on test and/or laboratory results; to clarify or alter previous instructions; to adjust therapy."
[12] Tr. 788-90.
[13] Tr. 3201-3207.
[14] Tr. 1959-66.
[15] Tr. 2225-27.
[16] Tr. 1174.
[17] Tr. 976-77, 986.
[18] Testimony of Janet Jordy, Tr. 1600, 1664, 1681-83, 1723.
[19] Tr. 865-73; 920-22.
[20] Tr. 3372-74.
[21] Tr. 927-28. Cf. State v. Cargille, 507 So.2d 1254 (La. 3rd Cir.1987), writ denied, 512 So.2d 1175 (La.1987). Five different Medicaid representatives explained to the defendant that he could not bill by the minute; criminal charges were filed only after he refused to follow a procedure of which he had ample notice.
[22] Tr. 1576-79.
[23] Tr. 1638-39; 1670-76.
[24] Tr. 3424-50.
[25] Tr. 3226. The state attempted to show that office personnel had "confronted" the Romeros about illegal billing prior to their indictment. However, the trial testimony of these women is contradicted by the statements they made to state investigators in April 1986. Janie Hollie, for example, told an investigator that to her knowledge she had never submitted a false claim to the Medicaid Program and she had never heard any of the office workers confront or explain that both doctors were billing incorrectly. Tr. 289-98. Only after talking with investigator Betty Yarborough did the office workers refer to "false claims." See Tr. 1484-92; 1507.
[26] The 39 remaining counts represent alleged misappropriation of less than $1000 over a 3-year period on a total of 11,000 claims made by the Romeros. There is no requirement that the state actually be defrauded or lose money for a person to be in violation of the statute; the crime consists of the knowing presentation of false or fraudulent claims. State v. Griffon, 448 So.2d 1287 (La.1984). However, the minimal amounts involved in this case are a factor to be considered in determining whether the Romeros had the requisite intent.
[1] The charges alleged fraudulent claims ranging from $2.08 to $40.00. The total amount in the eighty-eight counts on which defendants were convicted by the jury was less than $1,900.00 over a three-year period.