601 So.2d 694 (1992)
STATE of Louisiana
v.
William FINK.
No. 92-KA-005.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 1992.
*695 John M. Mamoulides, Dist. Atty., Robert Grant, Dorothy A. Pendergast, Asst. Dist. Attys., Louise Korns, of counsel, office of Dist. Atty., 24th Judicial Dist., Parish of Jefferson, Gretna, for plaintiff-appellee.
Joseph A. Watters, New Orleans, for defendant-appellant.
Before KLIEBERT, C.J., and GAUDIN and GOTHARD, JJ.
KLIEBERT, Chief Judge.
The defendant in this matter was originally charged by the State with attempted simple rape and battery. Subsequently, by bill of information filed on July 15, 1991, he was charged with attempted forcible rape. (R.S. 14:27, 14:42.1). After pleading not guilty, the defendant proceeded to trial on July 16, 1991. On the following day the jury returned a unanimous verdict of guilty as charged. On September 13, 1991, after review of a pre-sentence investigation, the trial court sentenced the defendant to 20 years at hard labor with the condition that *696 he be evaluated by the Department of Corrections for possible psychiatric treatment within the system and with credit for time served.
The defendant has appealed urging four assignments of error as follows:
1. The trial court erred in granting the State's Prieur Motion and allowing the jury to hear the testimony of a female co-employee.
2. The evidence adduced at trial was insufficient to support a verdict of attempted forcible rape.
3. A rational trier of fact could not have found from the evidence the essential elements of attempted forcible rape.
4. The sentence of twenty years at hard labor was excessive and an abuse of the trial court's discretion.
There is little controversy regarding the facts of the alleged crime. They are as follows:
On the evening of May 2, 1990, Cathy Bounds, the victim, sat inside of Maxwell's, a bar located in the French Quarter in New Orleans La., after completing her bartending work for the evening. Having argued with her boyfriend earlier, Cathy was upset and soon began to cry. Because of the argument, she had planned to stay with her friend Teresa that night. As she cried, the defendant, whom she had previously met, approached her accompanied by Teresa.
Upon observing that Cathy appeared to be depressed, the defendant informed her about a therapy program that he was forming with a psychiatrist wherein people would be brought "down to their lowest level and then building them up high again."
Subsequently, Teresa asked Cathy if she would accompany them to Metairie where they would "party for a little while" and Cathy agreed. The three then proceeded in defendant's truck to the Metairie Inn to see whether Teresa's cousins would join them. After they declined to go, the three proceeded on their way stopping first at the Player's Den. Thereafter, they stopped by Maximillian's where Cathy became "pretty loaded." She testified that she did not remember leaving the bar.
Cathy remembers next waking up in an unknown room lying on her back in a bed in the nude. Her hands were tied behind her back and she was gagged. The defendant was standing at the foot of the bed fully clothed. When she began to kick and roll from side to side, the defendant straddled her stomach and bit her forcefully on her left side and right breast. The defendant later removed the rag from her mouth and Cathy informed him that he was hurting her. After he pulled her up and untied her arms, he asked her if she would inform anyone about what had just occurred. When Cathy stood up, she observed her clothes on the side of the bed. She also noted that she was menstruating and had bled on both herself and the defendant's bed. After dressing she asked the defendant where she was and he responded that he would take her home. He showed her out and once outside she waited by his truck momentarily. When the defendant opened the vehicle's door, Cathy entered it and with his car phone she called her boyfriend to tell him that she would be coming home for the night.
While driving her home, the defendant repeatedly said that he just "wanted to keep that between us." When the defendant dropped her off at her home, her boyfriend was waiting by the door, but she walked inside without telling him anything.
The next morning, having observed her bruises, he confronted Cathy wanting to know what had happened; however, she again refused to tell him anything before proceeding to work. After speaking to a friend, she eventually decided to inform the police about the incident. Initially, she spoke to Officer Rushing who told her to come to the station. There, she related an account of the evening and identified the defendant. Due to a prior incident involving the defendant which Officer Trapani had investigated, he knew the defendant and was able to ascertain that the incident had occurred at the defendant's apartment. Thereafter, Officer Trapani obtained an arrest warrant and search warrant.
*697 Prior to trial the State filed a Motion of Intent to Use Evidence of Other Crimes pursuant to Article 720 of the Louisiana Code of Criminal Procedure; State v. Prieur, 277 So.2d 126 (1973) and State v. Abercrombie, 375 So.2d 1170 (1979), the purpose stated in the notice of using evidence of other crimes being to show defendant's knowledge, intent, guilty knowledge, system and motive. Following the "Prieur hearing," which involved an incident which occurred on March 13, 1990 involving defendant and another female co-employee, the trial judge ruled that the evidence would be admitted for the purpose offered. Thus, at trial the judge instructed the jury that evidence of commission of another offense was to be considered for the limited purpose of showing motive of specific intent to rape Cathy Bounds and that the defendant was not to be found guilty merely because another offense may have been committed with the other female. The latter was then allowed to give her testimony which revealed the following:
She met the defendant, a nurse (LPN), when he was attending to her boyfriend during his stay in Ochsner Hospital and he remarked to her that she looked like she was under a lot of stress. Because he was taking stress-related courses, he thought that he could help her cope with it. He gave her a form which she was to fill out and requested to go over it with her. At that time she was working at Ochsner Clinic adjacent to the hospital. Thereafter, the defendant proceeded to call her at work seeking to meet her. After declining several offers, she eventually decided to meet with him after work on March 13, 1990.
That evening at approximately 8:00 p.m. she arrived at the hospital where she had arranged to meet the defendant. The defendant was waiting outside in front of the hospital and approached her car on the passenger side. As she attempted to hand him the form through the window, he entered her car and said "Let's just park and we'll go over this." Since all of the parking spots were occupied in front of the hospital, she drove to the nearby parking garage where she was able to find a parking spot.
While they sat in her parked car, the defendant began talking to her about the questions on the form. After telling her to listen to him and follow whatever he said, he grabbed the seat belt and wrapped it around her arms and chest restraining her. Next, he reached in the back of her car and took a T-shirt which he stuffed in her mouth. He then grabbed the top of the seat belt and wrapped it around her head and through her mouth after he removed the T-shirt. She testified that she was scared and "thought he was going to try and rape me."
While she was restrained, the defendant related to her stories involving sexual activities. He asked her to imagine she was "on a dark and lonely highway, all by myself, and somebody appeared at the back seat and made me pull over to the side of the road and get out of the car and put a clamp around my neck and get down on my hands and knees and perform sexual activities."
The defendant told her that he would have to bring her down to her lowest level by treating her like a tramp and whore. He then told her to remove her pants and underwear in order that he could insert her underwear in her mouth to build up her trust. He then offered to exit her car while she removed her clothing if that would make her feel more comfortable. At no time during this encounter did the defendant say that he wanted to have sexual intercourse.
When others began to enter the parking garage, the defendant untied her. He indicated that he wanted to meet with her another day in order to go over the form before leaving the area.
Thereafter, she left the parking garage without informing the attendant about the incident. However, she did telephone a friend to inform him what had happened to her. Pursuant to his urging, the next morning she told her supervisor. He informed the administration who in turn notified the police.
The defendant's girlfriend testified that she and the defendant would act out bondage *698 (he would gag and tie her up) before having sexual intercourse. She also had and furnished to the investigator bondage books (presently in evidence) which the defendant maintained in her apartment. They acted out the bondage and had sex on the same day as the incident for which the defendant is here charged occurred.
We consider first the defendant's first assignment of error, i.e., the admission of a prior crime incident with a female co-employee.
LSA-C.E. art. 404(B)(1) provides:
B. Other crimes, wrongs or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In State v. Prieur, 277 So.2d 126 (La.1973), the Supreme Court established the requirement that there must be clear and convincing evidence that the defendant committed the other crime before such evidence could be admissible. Notwithstanding the enactment of the Louisiana Code of Evidence, the clear and convincing evidence standard in regard to other crimes evidence set forth in Prieur and its progeny remain applicable. LSA-C.E. art. 1103.
Before evidence of other crimes is admitted as proof of intent, three prerequisites must be satisfied: (1) the prior acts must be similar, (2) there must be a real genuine contested issue of intent at trial, and (3) the probative value of the evidence must outweigh its prejudicial effect. State v. Romero, 574 So.2d 330 (La.1990).[1]
The jury and apparently the trial judge believed the evidence met the criteria for admission in evidence under the Prieur case, supra. The defendant argues that the allowance of the other crime evidence was error because the State failed to show adequate proof of the first test required by State v. Hatcher, supra. We do not agree with the defendant.
Here there was clear and convincing evidence that the defendant committed the crime which was similar to the instant offense. The witness positively identified the defendant as the perpetrator who confined her by binding and gagging her with the seat belts of her car before requesting her to disrobe. In our view the other crime evidence was relevant to show the contested issue of specific intent to commit forcible rape and not merely to confine the victim without an intended rape.
In evaluating the sufficiency of the evidence to convict the defendant of forcible rape, the standard to be used by the appellate court is whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La.1988); State v. DiLosa, 529 So.2d 14 (5th Cir.1988), writ denied, 538 So.2d 1010 (La.1989).
To prove a crime of attempt, the State must show that the defendant had a specific intent to commit a crime and that he committed or omitted an act for the purpose and tending directly toward the accomplishment of his object. LSA-R.S. 14:27. Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequence to follow his act or failure to act. LSA-R.S. 14:10. *699 Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. State v. Graham, 420 So.2d 1126 (La.1982). Furthermore, specific intent is an ultimate legal conclusion to be resolved by the fact finders. State v. Graham, supra.
In order to commit an attempted forcible rape, an offender must have the specific intent to engage in anal or vaginal sexual intercourse without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances wherein the victim reasonably believes that such resistance would not prevent the act. LSA-R.S. 14:27, 14:42.1; State v. Doremus, 571 So.2d 831 (3rd Cir. 1990).
At trial Cathy Bounds testified to the facts previously mentioned. Additionally, she stated that the incident lasted approximately 30 minutes. She screamed the entire time, but "nothing would come out." The defendant never did say anything to her while she was restrained. When he was not biting her, he would just look at her. He never tried to kiss her or insert his penis in her vagina. He did, however, fondle and bite her breasts. From his actions the victim thought that he would rape her while in such a position; however, he did not.
Given the defendant's engagement in repeated consensual bondage prior to sexual intercourse with his girlfriend and his engagement in non-consensual bondage with another female prior to the incident here, his act of fondling and biting the breasts of the victim and the belief of both non-consensual females that the defendant intended to forcibly rape them, leads us to believe the evidence was sufficient to support the jury's determination the defendant possessed the specific intent to commit forcible rape and performed actions in furtherance of his goal. Although it is true the defendant did not consummate the rape, given the fact the victim here was menstruating could easily lead the jury to believe this was the reason for the defendant's termination of his attempt to forcibly rape the victim.
The conviction of attempted forcible rape carries a possible sentence of 20 years at hard labor, at least one year of which must be imposed without benefit of probation, parole, or suspension of sentence. LSA-R.S. 14:27, 14:42.1. Here, the trial court imposed the maximum sentence with the recommendation that the defendant be evaluated by the Department of Corrections for possible psychiatric treatment within the system.
As a general rule, maximum sentences are reserved for cases involving the most serious violations of the charged offense and for the worst kind of offender. State v. Quebedeaux, 424 So.2d 1009 (La. 1982), appeal after remand, 446 So.2d 1210 (La.1984). "Nothing else will justify the great sentencing discretion given the trial judge." State v. Jones, 398 So.2d 1049, 1053 (La.1981).
In imposing the maximum sentence the trial court gave the following reasons:
"In reviewing the sentencing guidelines of Article 894.1, the Court finds and believes that there is an undue risk that during the period of any suspended sentence or probation, the defendant would commit another crime. Also, in accordance with the same guidelines, the Court is equally convinced that the defendant is in need of correctional treatment that can be provided most effectively by his commitment to an institution. In reviewing the sentencing guidelines, search as I may, I can find no mitigating circumstances whatsoever that the Court can apply in any way to reduce this sentence. The Court notes specifically that the defendant has expressed no sorrow, no regret, no remorse for his actions. Instead, throughout these proceedings he has displayed an attitude of actually being afronted by the fact that anybody would question his actions. And his actions that the Court heard were horrendous.
From the presentence investigation report the Court notes that there is a history *700 of psychiatric evaluation and treatment. It is a lengthy history. The defendant pointed out this morning there were some discrepancies with that history. Notwithstanding those discrepancies, and giving the defendant the benefit of the doubt and saying that all of his corrections are applicable, this does not change the Court's position.
The Court is equally convinced that if the defendant is put on probation or given a suspended sentence in any way, that he will not seek treatment.
The Court has worked on this matter for quite some time prior to trial. At one point the Court released the defendant from jail on a rather lenient bond so that he could seek psychiatric treatment. I think he went to one visit and did not return, he did not follow up. This certainly displayed to the Court that he is not going to seek and go and continue with the proper treatment.
In the plea bargaining prior to trial the Court offered what it considered a rather lenient sentence and a suspended sentence with the condition being treatment and that was rejected by the defendant.
Unfortunately, the presentence investigation report says that his mother has given up on him and she has turned him over to God. Unfortunately, his father is deceased. This morning, I guess it is up to me and God and I have to do what I feel is necessary.
Here the trial court adequately complied with the sentencing guidelines in imposing the maximum sentence. See State v. James, 573 So.2d 1277 (4th Cir.1991). Furthermore, the imposition of the maximum sentence has been previously upheld. See State v. James, supra; State v. Capps, 461 So.2d 562 (3rd Cir.1984).[2] Hence, we cannot say the trial court abused its discretion.
For the reasons stated therefore the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The defendant argues that the allowance of the other crimes evidence was error because the State failed to show adequate proof of any of the five tests required by State v. Hatcher, 372 So.2d 1024 (1979). However, defendant's reliance on Hatcher is misplaced. In Hatcher, the Supreme Court set forth the requirements for the admissibility of other crimes evidence exhibiting almost the identical modus operandi or system whereas in the instant case the other crimes evidence was admitted to prove specific intent rather than system.
[2] In State v. James, supra, the court upheld the 20 year sentence imposed upon the defendant who was a first offender with two prior arrests, one of which was when he was a juvenile. The defendant, who was charged with forcible rape, grabbed the victim from behind and told her that if she screamed or resisted, he would kill her. As he held her by the neck, he told her to get onto the grass. After he started kissing her, he pulled down her pants and told her to put his penis in her vagina, which she did.

In State v. Capps, supra, the Court affirmed the 20 year sentence imposed upon the defendant who was charged with aggravated rape. The defendant grabbed a minor female from his doorstep and pulled her inside to his bedroom. Once inside, the defendant sat the victim on his lap and removed her jacket. She tried to get away, but was prevented. After hitting her about the face and choking her, he removed her jeans and panties and laid her on the floor. The defendant then laid on top of her while continuing to strike and choke her.